In re Warren MEINEN, Debtor.

James T. Healey, Plaintiff,

v.

Warren Meinen, Defendant.

Bankruptcy No. 97–26170–MBM.
Adversary No. 97–2520–MBM.

United States Bankruptcy Court,
W.D. Pennsylvania,
Pittsburgh Division.

Dec. 30, 1998.

ter "Millwrights' Plan" or "Plan"), which interest, is valued in the debtor's Bankruptcy Schedule B at $53,968.88, is not available to satisfy the debtor's liabilities, and (b) seeks a declaration by this Court that the debtor's interest in the Millwrights' Plan constitutes property of the debtor's bankruptcy estate. Plaintiff raises Count I because the debtor asserts that the Millwrights' Plan is an ERISA [1]-qualified plan and, as such, it contains an enforceable anti-alienation clause that effectively operates to exclude the debtor's interest in said plan from the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2). Plaintiff vigorously disagrees with the debtor's characterization of the Millwrights' Plan as an ERISA-qualified plan, primarily arguing in particular that (a) a plan, in order to be an ERISA-qualified plan, must also meet the tax qualification requirements of the Internal Revenue Code (hereafter "IRC"), and (b) the Millwrights' Plan, for several reasons, does not meet several of the federal tax qualification requirements. The debtor now moves for summary judgment in his favor on plaintiff's Count I, while plaintiff, in addition to responding to the debtor's motion, also cross-moves for summary judgment in his favor.

Mark Clement, Pittsburgh, PA, for James T. Healey.

Gary W. Short, Pittsburgh, PA, for Warren Meinen.

Jeffrey J. Leech, Pittsburgh, PA, for Carpenters' Combined Funds, Inc., appearing as amicus curiae.

Mary Reitmeyer, Pittsburgh, PA, Trustee.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH, Bankruptcy Judge.

James T. Healey, plaintiff herein and a judgment lien creditor of the above-captioned debtor, objects to the discharge of Warren Meinen, said debtor and defendant herein, on several grounds. Plaintiff, in Count I of his complaint, (a) asks that the debtor be denied a discharge pursuant to 11 U.S.C. § 727(a)(5) because, according to plaintiff, the debtor has failed to explain satisfactorily why the debtor's interest in the terminated Millwrights' Local Union No. 2235 Savings Fund (hereaf-

The Court notes that the contentions of both of the parties herein focus on the debtor's interest in the terminated Millwrights' Plan even though (a) the Millwrights' Plan was terminated at some point in 1997, and all of the assets within the Millwrights' Plan were distributed in 1997, see Meinen's Affidavit, para. 6, and (b) the debtor, on August 29, 1997, elected to directly roll over all of the funds distributed to him from his interest in the Millwrights' Plan to the Carpenters' District Council of Western Pennsylvania Annuity and Savings Fund (hereafter "Carpenters' Plan"). See Meinen's Affidavit, para. 7 & Meinen's Appendix C.[2] The Court concludes, however, that the

1. ERISA stands for the Employee Retirement Income Security Act of 1974, which is codified at 29 U.S.C. §§ 1001–1461.

2. Plaintiff does not appear to dispute that the Millwrights' Plan was terminated in 1997 and that the debtor rolled over distributed funds to another plan. Both of these facts are consistent with the contents of a letter dated July 30, 1997, which plaintiff concedes he received, wherein the Board of Trustees for the Millwrights' Plan informed plan participants that (a) said plan would ultimately be terminated by, most likely, some time prior to December 31, 1997, and (b) they could exercise several options with respect to any funds that they had remaining in said plan. See

parties' focus is correct because (a) the contents of a bankruptcy estate are established as of the commencement of a bankruptcy case, *see* 11 U.S.C.A. § 541(a)(1) (West 1993), which means that whether property can properly be excluded from said estate must also be determined as of said commencement, (b) the debtor filed his Chapter 7 bankruptcy petition on August 26, 1997, which is three days prior to when he rolled over to the Carpenters' Plan those funds that he received in distribution from his interest in the Millwrights' Plan, which means that the debtor's funds which now reside in the Carpenters' Plan resided in his account with the Millwrights' Plan on the date that he filed his bankruptcy petition, and (c) therefore, whether said funds can properly be excluded from the debtor's bankruptcy estate depends upon whether his interest in the terminated Millwrights' Plan, as opposed to his present interest in the Carpenters' Plan, can be excluded from said bankruptcy estate pursuant to § 541(c)(2).

Carpenters' Combined Funds, Inc., in its capacity as Administrator of the Millwrights' Plan (hereafter "Carpenters"), moved to intervene in the above-captioned adversary proceeding only with respect to plaintiff's Count I because it asserted that it has a direct and substantial interest in the subissue raised by plaintiff regarding the tax qualification status of the Millwrights' Plan, which status plaintiff asserts bears upon whether the debtor's interest in the Plan can be excluded from the debtor's bankruptcy estate. While the Court denied Carpenters' motion to intervene by order dated February 25, 1998, the Court, in the same order, granted Carpenters leave to file an *amicus curiae* brief regarding the issues raised in plaintiff's Count I "within the same time period allotted to ... [the debtor] for his response to plaintiff's brief regarding the same issue[s]." Although Carpenters has filed its *amicus curiae* brief, plaintiff now moves to strike said brief and an accompanying affidavit filed by Carpenters because, plaintiff asserts, (a) Carpenters filed its brief prematurely, (b) Carpenters somehow exceeded its capacity as *amicus curiae* by filing its supporting affida-

vit, and (c) Carpenters, in its *amicus curiae* brief, inappropriately advocates the position which is taken by the debtor.

The Court, in this opinion, shall dispose of the parties' dueling motions for summary judgment as to Count I of plaintiff's complaint, as well as plaintiff's motion to strike Carpenters' *amicus curiae* brief. For the reasons set forth herein, the Court (a) **GRANTS** the debtor's motion for summary judgment on plaintiff's Count I and **DENIES WITH PREJUDICE** plaintiff's similar motion, which means that (i) the debtor's discharge shall not be denied pursuant to § 727(a)(5), and (ii) the debtor is correct in excluding his interest in the Millwrights' Plan from his bankruptcy estate, and (b) **DENIES WITH PREJUDICE** plaintiff's motion to strike Carpenters' *amicus curiae* brief and supporting affidavit.

## STATEMENT OF FACTS

The Millwrights' Plan, prior to its termination, covered those employees of employers who were a party (i.e., participating employers) to the collective bargaining agreement (hereafter "the Collective Bargaining Agreement") with the Millwrights and Machinery Erectors of the United Brotherhood of Carpenters and Joiners of America Local Union No. 2235 (hereafter "the Union"). *See* Meinen's Affidavit, para. 5; Plaintiff's Brief, p. 11. The Collective Bargaining Agreement required participating employers to make periodic contributions to the Millwrights' Plan as a percentage of employees' compensation, and such contributions needed to be made regardless of whether the participating employers operated at a profit. *See* Meinen's Affidavit, para. 12; Plaintiff's Brief, p. 10.

The Plan Document for the Millwrights' Plan, as apparently amended on September 20, 1995, with amendments made effective as of October 1, 1991, *see* Meinen's Appendix D, IRS Form 5303 Application for Determination for Collectively Bargained Plan dated 9/13/95, item 3a, and apparently in effect except perhaps for pertinent termination pro-

Healey's Affidavit, para. 35 & Healey's Exhibit M.

visions not therein contained, contains the following pertinent provisions:

(a) A clause providing that:

No benefit provided by the ... [Plan] will be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to do so shall be void. To the maximum extent permitted by law, no such benefit shall be liable for or subject to attachment or other legal process for or against any payee.

*See* Meinen's Appendix A, Millwrights' Plan Document, Art. X, § 10.3 at 39.

(b) A designation of the Millwrights' Plan "as a profit sharing plan under Section 401(a) of the Code." *See Id.* at Art. II at 3.

(c) A statement that "[t]he primary purpose of the ... [Plan] is to encourage and assist Employees in providing funds for old age security by supplementing monthly pensions from the Carpenters' Pension Plan with a savings plan." *See Id.*

(d)(i) An annual option to participating plan beneficiaries either to (1) withdraw employer contributions credited to their accounts for the October 1–September 30 Plan year that ended two years prior to September 30 of the immediately preceding Plan year, or (2) permit such amounts to remain in their accounts "until the severance of ... [their] employment in the industry by reason of ... [their] retirement, death, permanent withdrawal from the industry in the geographic area covered by the jurisdiction of the Union, or on April 1 of the calendar year following the calendar year of attained age seventy and one-half (70½)." *See Id.* at Art. VI, § 6.7(a) at 17–18.

(ii) An option to participating plan beneficiaries to withdraw, upon application, amounts then credited to their accounts except for employer contributions made to the Plan during the two-year period preceding payment of said withdrawal, except that withdrawal of employer contributions made within the aforementioned two-year period is permitted to enable a plan beneficiary to meet a financial hardship. *See Id.* at Art. VI, § 6.7(c) at 18–20. The Plan provides that the following, upon an appropriate showing by the beneficiary, are the only reasons for obtaining a hardship withdrawal:

(1) Expenses for medical care described in Section 213(d) of the Code previously incurred by the Employee, the Employee's spouse, or any dependents of the Employee or amounts necessary for these persons to obtain medical care described in Section 213(d) of the Code;

(2) Purchase (excluding mortgage payments) of a primary residence of the Employee;

(3) Tuition payment and related educational fees for the next twelve (12) months of post secondary education for the Employee or a dependent in his immediate family;

(4) The need to prevent eviction of the Employee from his principal residence or the foreclosure of the mortgage on the Employee's principal residence; and

(5) Expenses relating to the death of a dependent in the Employee's immediate family.

*Id.* at Art. VI, § 6.7(c) at 19–20.

(e)(i) A definition of the term "Employer Contributions" for Plan purposes as those "payments by the Employers to the ... [Plan] as required under the terms of collective bargaining agreements and shall be made without regard to current or accumulated profits." *See Id.* at Art. IV, § 4.7 at 9.

(ii) A definition of the term "Employer" for Plan purposes as "any employer ... who has in effect a collective bargaining agreement requiring periodic contributions to the ... [Plan]." *See Id.* at Art. IV, § 4.6 at 9.

On September 13, 1995, Carpenters submitted to the IRS on the IRS' Form 5303 an application for a determination, according to Carpenters, that the Millwrights' Plan is a tax-qualified profit-sharing plan. *See* Mein-

en's Affidavit, para. 9 & Meinen's Appendix D. The application reflects the following:

(a) The determination requested by Carpenters regards an amendment of the Plan subsequent to the Plan's initial qualification. The amendment was signed on September 20, 1995, and was effective as of October 1, 1991. *See* Meinen's Appendix D, Form 5303, line 3a.

(b) The Plan had received a determination letter prior to this application. *See Id.* at line 3b.

(c) Carpenters identified the Plan as a multi-employer profit-sharing plan. *See Id.* at lines 5b & 6.

(d) That a definite formula is used to determine employer contributions to the Plan. *See Id.* at line 11b.

On December 14, 1995, the IRS, as part of its determination process, requested that Carpenters submit to it that portion of the pertinent collective bargaining agreement which included the formulas for determining the amount and allocation of employer contributions to the Plan. *See Id.* Carpenters complied with this request by the IRS on December 20, 1995, *see Id.,* after which the IRS issued a "favorable determination" letter on January 5, 1996. *See* Meinen's Appendix E. The IRS, within the "favorable determination" letter, noted, *inter alia,* that (a) "[c]ontinued qualification of the plan under its present form will depend on its effect in operation," *see Id.,* (b) "[t]his determination letter is applicable for the amendment[s] [to the Millwrights' Plan] adopted on September 20, 1995," *see Id.,* (c) "[t]his letter is issued under Rev. Proc. 93–39 and considers the amendments required by the Tax Reform Act of 1986," *see Id.,* and (d) the Plan satisfies several particular discrimination tests required for tax qualification as described in the letter. *See Id.*

### DISCUSSION

■ As an initial matter, the Court concludes that plaintiff's Count I does not even state an actionable basis upon which the debtor's Chapter 7 discharge can be denied pursuant to § 727(a)(5). 11 U.S.C. § 727(a)(5) provides for denial of a discharge if "the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C.A. § 727(a)(5) (West 1993). However, the only asset at issue in plaintiff's Count I is the debtor's interest in the Millwrights' Plan, and plaintiff does not allege anywhere in his complaint that the debtor has lost this asset. Furthermore, the debtor has taken the position, both in his Bankruptcy Schedule B and in numerous other pleadings, that his interest in the Millwrights' Plan is not property of his bankruptcy estate in accordance with § 541(c)(2) and, thus, said interest will not be available for distribution to creditors. By indicating the aforementioned position in writing on numerous occasions, the debtor has clearly and concisely explained to everyone, including plaintiff, the reason why his Plan interest will not be available to meet his liabilities; in fact, said explanation by the debtor is repeated by plaintiff himself in his Count I. That plaintiff disagrees with the substance of the debtor's explanation, and even if the Court were to agree that plaintiff is correct in so disagreeing, does not mean that the debtor's explanation is unsatisfactory. Indeed, the Court would substantially chill appropriate advocacy on behalf of many debtors if it were to conclude otherwise and simply deny debtors their discharge in the event that the Court ultimately disagrees with positions taken on their behalf. Therefore, the Court concludes that (a) the debtor has clearly and concisely explained why his Plan interest will not be available to meet his liabilities, and (b) plaintiff's Count I, as a result, does not even state a basis for denial of the debtor's discharge pursuant to § 727(a)(5). Consequently, with respect to that part of plaintiff's Count I that seeks to deny the debtor his discharge under Chapter 7 the Court shall **GRANT** the debtor's summary judgment motion and **DENY WITH PREJUDICE** plaintiff's similar motion.

The other relief that plaintiff seeks in his Count I is a declaration by this Court that the debtor's interest in the Millwrights' Plan constitutes property of the debtor's bankruptcy estate. This relief constitutes a contested matter under Fed.R.Bankr.P. 9014 that is totally unrelated to the debtor's discharge under Chapter 7. Although such re-

lief should have been sought by plaintiff in a separate motion, rather than as part of the adversary complaint seeking a denial of the debtor's discharge, the Court will proceed to entertain plaintiff's request at this time.[3] However, before proceeding further on whether the debtor's interest in the Millwrights' Plan constitutes property of his bankruptcy estate (i.e., whether the debtor can properly exclude said interest from the bankruptcy estate), the Court first wishes to dispose of plaintiff's motion to strike the *amicus curiae* brief of, and accompanying affidavit filed on behalf of, Carpenters.

## I. *Whether the amicus curiae brief of, and accompanying affidavit filed on behalf of, Carpenters should be stricken?*

Plaintiff moves to strike Carpenters' *amicus curiae* brief and supporting affidavit because, plaintiff asserts, (a) Carpenters filed its brief prematurely, (b) Carpenters somehow exceeded its capacity as *amicus curiae* by filing its supporting affidavit, and (c) Carpenters, in its *amicus curiae* brief, inappropriately advocates the position which is taken by the debtor. Before addressing each of the preceding points, the Court notes that there does not appear to be any rule or statute that is applicable within a federal district court or bankruptcy court that governs, or that even furnishes standards by which those courts can ascertain the propriety of, the participation of *amicus curiae* or the content of *amicus* briefs. *See United States v. Gotti*, 755 F.Supp. 1157, 1158 (E.D.N.Y.1991). Nevertheless, a body of caselaw has developed regarding standards pertaining to the participation of entities as *amicus curiae* and the briefs filed by such entities in that capacity, and the Court will refer to that authority in disposing of each of the points raised by plaintiff.

■ With respect to the timing of Carpenters' *amicus* brief, the Court rejects plaintiff's contention that Carpenters filed its *amicus* brief prematurely by filing said brief on July 13, 1998, which date was (a) also the date upon which the debtor moved for summary judgment, and (b) prior to when plaintiff filed his answer, cross-motion for summary judgment, affidavit, and brief in support of his summary judgment motion. Although the Court, in its February 25, 1998 order, directed Carpenters to file its *amicus* brief "within the same time period allotted to ... [the debtor] for his response to plaintiff's brief," the Court's direction failed to anticipate a pre-trial dispositive motion such as that which was ultimately filed by the debtor on July 13, 1998. Furthermore, the Court never formally set a briefing schedule with respect to plaintiff and the debtor on the issue for which Carpenters wished to file its *amicus* brief because of the debtor's summary judgment motion, thereby also creating confusion for Carpenters as to its deadline for filing its *amicus* brief. In light of the Court's failure to subsequently apprise Carpenters as to the aforementioned deadline, the Court holds that Carpenters was justified in, and Carpenters will thus not be penalized for, filing its brief on July 13, 1998.

The Court also holds that Carpenters was technically not premature in filing its *amicus* brief when it did in any event despite the fact that said brief preceded plaintiff's filing of his own brief on the same issue because, substantially prior to July 13, 1998, plaintiff had filed his complaint, the debtor had answered said complaint, and both parties had responded to Carpenters' unsuccessful intervention motion. In each of these pleadings, both parties fully set forth their positions on the issue for which Carpenters wished to file its *amicus* brief, as well as the basis for said positions. Because Carpenters had obviously acquainted itself with these pleadings prior to filing its *amicus* brief, the Court cannot conclude that Carpenters was unaware of either parties' position when Carpenters composed and filed its *amicus* brief. This particular fact serves to distinguish the instant situation from that which is presented in *Gotti* wherein the court therein found that the entity seeking to participate as *amicus*

---

**3.** The Court is certain that the Chapter 7 trustee has standing to pursue the declaratory relief which plaintiff presently seeks in the instant adversary proceeding. However, the Court is uncertain, and thus will presume only for the purpose of this particular matter, that plaintiff also possesses standing to pursue said declaratory relief.

curiae was, at the time that it composed its amicus brief, unaware of the precise position of one of the parties. See Gotti, 755 F.Supp. at 1159.

Finally, the Court agrees in large part with plaintiff's view that much of the content of Carpenters' amicus brief is contained in the debtor's summary judgment motion, brief in support thereof, and affidavit. However, this conclusion persuades the Court that plaintiff will not be prejudiced if the amicus brief is allowed to remain on the docket, thereby dictating that said brief not be stricken at this time.

■■■ As for plaintiff's contention that Carpenters exceeded its capacity as amicus curiae by filing its supporting affidavit, the Court cannot agree because (a) the content of the affidavit relates solely to matters contained within Carpenters' brief, (b) it is clear to the Court that the affidavit was only offered to assist the Court in considering Carpenters' brief, and (c) it is solely within this Court's discretion to determine the extent and manner of Carpenters' participation in the instant matter as amicus curiae, see, e.g., Alexander v. Hall, 64 F.R.D. 152, 155 (D.S.C. 1974); Waste Management of Pennsylvania, Inc. v. City of York, 162 F.R.D. 34, 36 (M.D.Pa.1995), which means that the Court can either accept or reject the affidavit for consideration as it sees fit. However, even if Carpenters did exceed its authority as amicus curiae by submitting the affidavit in question, the Court fails to understand how plaintiff has been prejudiced thereby given that (a) the content of said affidavit, other than that which is contained in paragraphs 14–16 thereof, is also established by virtue of the debtor's affidavit and the parties' exhibits, and (b) the content of paragraphs 14–16 of said affidavit is not relevant to any part of the Court's decision herein.[4]

■■■ Lastly, the Court rejects outright plaintiff's assertion that Carpenters' amicus brief is inappropriate because (a) Carpenters, in its brief, essentially advocates the position which is taken by the debtor, and (b) Carpenters attempts to further its own interests by

submitting the brief. Courts uniformly point out that, "by the nature of things[,] an amicus is not normally impartial." Strasser v. Doorley, 432 F.2d 567, 569 (1st .Cir.1970); Gotti, 755 F.Supp. at 1158 (citing Strasser); Waste Management of Pennsylvania, 162 F.R.D. at 36 (citing Gotti, which cites Strasser). Furthermore, "[t]here is no rule ... that amici must be totally disinterested." Hoptowit v. Ray, 682 F.2d 1237, 1260 (9th Cir.1982); Waste Management of Pennsylvania, 162 F.R.D. at 36 (citing Concerned Area Residents for the Environment v. Southview Farm, 834 F.Supp. 1410, 1413 (W.D.N.Y. 1993), which quoted Hoptowit). Moreover, courts routinely remark that, without the joint consent of the parties, a court should only allow participation by an amicus curiae when, inter alia, "the amicus has a special interest that justifies his having a say." See Strasser, 432 F.2d at 569; Waste Management of Pennsylvania, 162 F.R.D. at 36 (citing Strasser); News and Sun–Sentinel Co. v. Cox, 700 F.Supp. 30, 31–32 (S.D.Fla.1988).

Therefore, the Court holds that (a) Carpenters did not file its amicus brief prematurely, (b) Carpenters did not exceed its capacity as amicus curiae by filing its supporting affidavit, (c) the participation by Carpenters as amicus was not inappropriate even if (i) Carpenters, in its brief, essentially advocated the position taken by the debtor, and (ii) Carpenters attempted to advance its own interests by participating as amicus, and (d) Carpenters' amicus brief and supporting affidavit need not be stricken at this time in any event since plaintiff neither has been, nor will he in the future be, prejudiced by either of them. Consequently, plaintiff's motion to strike Carpenters' amicus curiae brief and supporting affidavit is **DENIED WITH PREJUDICE.**

II. *Whether the debtor's interest in the Millwrights' Plan constitutes property of his bankruptcy estate (i.e., whether the debtor can properly exclude said interest from the bankruptcy estate)?*

Whether the debtor's interest in the Millwrights' Plan constitutes property of his

4. The content of paragraphs 14–16 of Carpenters' affidavit appears to be relevant to Carpenters' motion to intervene in this adversary proceeding, which is neither here nor there since said motion has already been decided adversely to Carpenters.

bankruptcy estate depends, in this instance, entirely upon whether the debtor can properly exclude said interest from the estate pursuant to § 541(c)(2). 11 U.S.C. § 541(c)(2) "excludes from the bankruptcy estate property of the debtor that is subject to a restriction on transfer enforceable under 'applicable nonbankruptcy law.'" *Patterson v. Shumate*, 504 U.S. 753, 755, 112 S.Ct. 2242, 2245, 119 L.Ed.2d 519 (1992). The U.S. Supreme Court in *Shumate* held that "[t]he anti-alienation provision required for ERISA qualification and contained in the [ERISA-qualified pension] Plan at issue in ... [*Shumate*] constitutes an enforceable transfer restriction for purposes of § 541(c)(2)'s exclusion of property from the bankruptcy estate." *Id.*, 504 U.S. at 760, 112 S.Ct. at 2248. Therefore, if the Millwrights' Plan is an "ERISA-qualified plan" as that term is used by the Supreme Court in *Shumate*, and the Plan contains the aforementioned anti-alienation provision, then the debtor's interest in the Plan is properly excluded from his bankruptcy estate.

However, the parties herein dispute whether the Millwrights' Plan is an "ERISA-qualified plan" as that term is used by the Supreme Court in *Shumate*. While plaintiff appears to concede, as well he should, that the Plan, at Article X, § 10.3 therein, contains an anti-alienation clause that satisfies either ERISA § 206(d)(1)[5] or IRC § 401(a)(13)(A),[6] plaintiff nevertheless contends that the Millwrights' Plan is not an ERISA-qualified plan because, according to plaintiff, (a) a plan, in order to be an ERISA-qualified plan, must also meet the relevant tax qualification requirements of the Internal Revenue Code, and (b) the Millwrights' Plan, for several reasons, does not meet several of the federal tax qualification requirements. The debtor and Carpenters, on the other hand, maintain that the Millwrights' Plan is an ERISA-qualified plan because, they assert, (a) a plan need not meet federal tax qualification requirements in order to be

ERISA-qualified, and (b) even if an ERISA-qualified plan must also be tax-qualified, the Millwrights' Plan is tax qualified.

The Court ultimately concludes, as a matter of law, that the debtor's interest in the Millwrights' Plan may be excluded from property of the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2) even if an ERISA-qualified plan must satisfy all of the requirements for federal tax qualification and the Plan is not tax-qualified, provided that the Plan (a) is subject to ERISA, and (b) contains an anti-alienation clause that satisfies either ERISA § 206(d)(1) or IRC § 401(a)(13)(A). Additionally, the Court concludes that the Millwrights' Plan is actually subject to ERISA, which means that, consistent with the preceding legal conclusion, the Plan may be excluded from property of the debtor's bankruptcy estate. Finally, the Court also concludes that the Plan was, and remains, tax-qualified, which means that (a) it is an "ERISA-qualified plan" regardless of how that phrase is defined, and (b) it may be excluded from property of the debtor's bankruptcy estate. On the strength of the preceding conclusions, the Court will, with respect to the remaining relief sought by plaintiff in his Count I, **GRANT** the debtor's summary judgment motion and **DENY WITH PREJUDICE** plaintiff's similar motion. This decision by the Court is appropriate at the summary judgment stage because the Court determines that a genuine issue does not exist as to any material fact, and the debtor, given the Court's legal conclusions, is entitled to judgment as a matter of law.

A. *What is an "ERISA-qualified plan," and must a pension plan meet the tax qualification requirements of the Internal Revenue Code in order for an interest therein to be excluded from property of the estate?*

The U.S. Supreme Court in *Shumate*, as mentioned above, held that "[t]he anti-alien-

---

5. ERISA § 206(d)(1) provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." ERISA § 206(d)(1), 29 U.S.C.A. § 1056(d)(1) (West 1999).

6. IRC § 401(a)(13)(A) provides, in pertinent part, that "[a] trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated." IRC § 401(a)(13)(A) (West 1998).

ation provision required for *ERISA qualification* and contained in the [*ERISA-qualified* pension] Plan at issue in ... [*Shumate*] constitutes an enforceable transfer restriction for purposes of § 541(c)(2)'s exclusion of property from the bankruptcy estate." *See Shumate*, 504 U.S. at 760, 112 S.Ct. at 2248 (emphasis added). Unfortunately, the Supreme Court failed to address in its *Shumate* opinion precisely what it meant by the term "ERISA-qualified plan." *See, e.g., In re Hall*, 151 B.R. 412, 417 (Bankr.W.D.Mich. 1993). The Supreme Court's use of this particular term has engendered much confusion because "[t]he term 'ERISA qualified' ... is not a term of art and is not defined in the Bankruptcy Code, the IRC, or ERISA[, and] ... it is not even a term used by employee benefit practitioners." *Hall*, 151 B.R. at 417 (citing J. Gordon Christy & Sabrina Skeldon, *Shumate and Pension Benefits in Bankruptcy*, 2 *J.Bankr.L. & Prac.* 719, 722–23 (1992)). Commentators highlight this confusion by pointing out that:

> [Pension] plans do not qualify under ERISA, at least not in the sense [that] they qualify for special treatment under the IRC. Rather, ... the plan is *subject to ERISA* if the plan [comports with ERISA § 3(2), 29 U.S.C. § 1002(2)].... A plan is *subject to ERISA* solely on the basis of the type of benefits it provides. Beyond that there is nothing under ERISA similar to the multitudinous requirements under the IRC. *Accordingly, employee benefit practitioners refer to "plans subject to ERISA," "plans governed by ERISA," or "ERISA plans," but they do not generally refer to "ERISA qualified" plans.*

*Id.* (quoting Christy & Skeldon, *supra* p. 377, at 725) (emphasis theirs).

As a consequence of this confusion, post-*Shumate* courts cannot be certain whether the Supreme Court, by its use of the term "ERISA-qualified" plan, intended to refer to "(1) a plan [that is] subject to ERISA; (2) a plan [that is] subject to ERISA [and] which contains an anti-alienation clause; or (3) a plan that is tax qualified under I.R.C. § 401(a), subject to ERISA, and [which] has an anti-alienation provision as required by

ERISA § 206(d)(1)." *Id.* Numerous post-*Shumate* courts have adopted the view that the Supreme Court, when referring to an "ERISA-qualified" plan in *Shumate*, was referring to a plan that is tax qualified under I.R.C. § 401(a), subject to ERISA, and which has an anti-alienation provision as required by ERISA § 206(d)(1). *See Hall*, 151 B.R. at 419–20; *In re Nolen*, 175 B.R. 214, 217–18 (Bankr.N.D.Ohio 1994); *In re Foy*, 164 B.R. 595, 597 (Bankr.S.D.Ohio 1994); *In re Orkin*, 170 B.R. 751, 753–54 (Bankr.D.Mass.1994). However, an approximately equal number of courts have adopted the competing view that the Supreme Court in *Shumate*, when referring to an "ERISA-qualified" plan, envisioned a plan that is subject to, or governed by, ERISA, and which contains an anti-alienation clause that is enforceable under ERISA, but not one that necessarily satisfies the tax qualification requirements under I.R.C. § 401(a). *See In re Hanes*, 162 B.R. 733, 740 (Bankr.E.D.Va.1994); *In re Craig*, 204 B.R. 756, 757–61 (D.N.D.1997); *In re Bennett*, 185 B.R. 4, 6 (Bankr.E.D.N.Y.1995); *In re Kaplan*, 162 B.R. 684, 691 (Bankr. E.D.Pa.1993), *aff'd*, 189 B.R. 882 (E.D.Pa. 1995); *S.E.C. v. Johnston*, 922 F.Supp. 1220, 1224–27 (E.D.Mich.1996). After substantial research and much reflection, this Court is quite certain that the Supreme Court in *Shumate*, when it referred to an "ERISA-qualified" plan, was referring to a plan that is at least both subject to ERISA and which contains an anti-alienation clause enforceable under ERISA. However, as the discussion in the next two paragraphs of this opinion demonstrates, this Court cannot be certain whether the Supreme Court, when referring to an "ERISA-qualified" plan, necessarily contemplated one that also must satisfy the tax qualification requirements under I.R.C. § 401(a).

This Court is aware that, "[t]o encourage compliance with ERISA, Title II of ERISA amended the Internal Revenue Code to provide tax benefits to both employers and employees." *Hanes*, 162 B.R. at 738–39 (citing *In re Conroy*, 110 B.R. 492, 495 (Bankr. D.Mont.1990); *In re Komet*, 104 B.R. 799, 803–04 (Bankr.W.D.Tex.1989)). Provisions in "Title II of ERISA ... specifically reference[ ] ... [and amend IRC] § 401(a)," *see*

*Conroy,* 110 B.R. at 495, which section of the IRC "establishes certain criteria for a pension plan to be 'tax qualified,'" *Hall,* 151 B.R. at 418, after which employers and employees may then receive preferential tax treatment. *See Id.* at n. 16. Because portions of Title II of ERISA actually add additional tax qualification requirements to the IRC, and in particular to IRC § 401(a), at least one court has concluded that "a 'qualified plan' under ERISA is synonymous with a 'tax-qualified plan.'" *Conroy,* 110 B.R. at 495. Recognizing this, the Court does not doubt that many courts that have used the phrase "ERISA-qualified plans," including perhaps the Supreme Court in *Shumate,* did so with the intent of referring to plans that not only are subject to ERISA but also which are "tax-qualified" and, thus, able to take advantage of the tax benefits provided by the IRC, as amended by Title II of ERISA.[7]

However, this Court also notes that the Supreme Court in *Shumate* expressly held that "[s]ection 206(d)(1) of ERISA ... clearly imposes a 'restriction on the transfer' of a debtor's 'beneficial interest' in ... [a] trust," as does "[t]he coordinate section of the ... [IRC], 26 U.S.C. § 401(a)(13)." *Shumate,* 504 U.S. at 759, 112 S.Ct. at 2247. The *Shumate* Court further held that "these transfer restrictions are 'enforceable,' as required by § 541(c)(2)," by virtue of ERISA §§ 404(a)(1)(D) and 502(a)(3) & (5), 29 U.S.C. §§ 1104(a)(1)(D) and 1132(a)(3) & (5). *Id.,* 504 U.S. at 760, 112 S.Ct. at 2247; *see also Guidry v. Sheet Metal Workers National Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990). These particular legal conclusions by the Supreme Court are significant because (a) all of Title I of ERISA, which is now codified at 29 U.S.C. §§ 1001–1191c, applies generally to both tax-qualified plans and those plans that are not

tax-qualified, *see* 29 C.F.R. § 2530.200a–1(a) (1998); *see also infra* p. 382,[8] (b) Part 2 of Subtitle B of *Title I of ERISA,* which is now codified at 29 U.S.C. §§ 1051–1061, contains, *inter alia,* the requirement in ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1), that a plan contain an anti-alienation clause, and (c) consequently, "as a matter of both federal policy and federal law, private employee pension benefit plans must contain the prophylactic language dictated by Section 206(d) of ERISA [ (i.e., the anti-alienation clause) ] *regardless [of] whether ... [they are] tax-qualified." Komet,* 104 B.R. at 804 (emphasis added). Therefore, on the basis of the preceding sentence and the two aforementioned legal conclusions by the Supreme Court in *Shumate,* one can also argue that (a) an interest in a pension plan that is subject to, or governed by, ERISA, and which also contains an anti-alienation clause as required pursuant to ERISA § 206(d)(1), is necessarily excluded from property of the bankruptcy estate pursuant to § 541(c)(2) regardless of whether said pension plan is also tax-qualified, and (b) the Supreme Court in *Shumate* thus did not even need to determine whether the pension plan dealt with therein was tax-qualified. *See also Hanes,* 162 B.R. at 740 (concluding, *inter alia,* that the Supreme Court's "references in *Shumate* to the tax code simply acknowledge that the tax code requires, in conjunction with ERISA, pension plans to contain non-alienation provisions"); *Craig,* 204 B.R. at 759–61 & n. 3 (quoting Christy & Skeldon, *supra* p. 19, at 725–26 n. 25, to the effect that "[t]he term 'ERISA qualified' plan can be most reasonably interpreted as meaning 'plan subject to ERISA' ... because the bankruptcy ... [exclusion] addressed by the [*Shumate* ] Court concerns Section 206(d)(1) of ERISA, which is completely independent of the quali-

---

**7.** For example, several of the Circuit Courts of Appeal in the cases cited at note 20 of *In re Hall,* by utilizing language such as "ERISA qualified," may have intended to refer to plans that both are subject to ERISA and are tax-qualified. *See Hall,* 151 B.R. at 419.

**8.** When courts and commentators state that a plan is subject to, or governed by, ERISA what they are generally, if not uniformly, referring to is *Title I* of ERISA in particular. That is because Title I contains the bulk of the provisions which

provide protection for employees' benefit rights (indeed, Title I is so captioned), while Titles II–IV deal with, respectively, amendments to the IRC, jurisdictional and administrative matters, and federal plan termination insurance via the Pension Benefit Guaranty Corporation. Therefore, this Court henceforth intends to refer solely to Title I of ERISA when it states, or uses language to the effect, that a plan is subject to, or governed by, ERISA.

fication requirements under the IRC"). As a result, one can also surmise that the *Shumate* Court, when it used the term "ERISA-qualified plan," contemplated a plan that was merely subject to, or governed by, ERISA regardless of whether it was also tax-qualified.[9]

■ As can be seen from the two preceding paragraphs, substantial confusion exists regarding precisely what the Supreme Court had in mind when it continually referred to an "ERISA-qualified" plan in *Shumate*. Fortunately, however, this Court finds that it need not resolve that issue. That is because this Court holds, on the strength of those legal conclusions elucidated by the Supreme Court in *Shumate* and referred to in the preceding paragraph, as well as pertinent provisions of, and regulations expanding upon, ERISA, that, as a legal matter, an interest in a pension plan that is subject to, or governed by, ERISA, and which also contains an anti-alienation clause as required pursuant to ERISA § 206(d)(1), is excluded from property of a bankruptcy estate pursuant to § 541(c)(2) regardless of whether said pension plan is also tax-qualified. Furthermore, this Court can hold as it does *even if it were* to find that the *Shumate* Court, when using the phrase "ERISA-qualified" plan, actually contemplated a plan that is also tax-qualified, because, *in that event*, this Court could properly conclude, and then distinguish *Shumate* on the basis, that the *Shumate* Court (a) dealt with a plan that was tax-qualified, and (b) did not face the issue of, and thus necessarily did not resolve, whether

a debtor can exclude from a bankruptcy estate an interest in a plan that (i) contains an anti-alienation clause as required pursuant to ERISA § 206(d)(1), (ii) is subject to ERISA, but (iii) *nevertheless is not "ERISA-qualified."* [10] As a result, and because the Millwrights' Plan contains an anti-alienation clause that satisfies ERISA § 206(d)(1), this Court needs only to ascertain whether the Plan is subject to, or governed by, ERISA in order to determine whether the debtor's interest in the Plan can be excluded from property of the estate pursuant to § 541(c)(2). However, and as will be demonstrated in the last section of this opinion, the Millwrights' Plan also meets the tax qualification requirements of IRC § 401(a) in any event, which means that the debtor's interest in the Plan can be excluded from property of the estate pursuant to § 541(c)(2) even if the Plan must be tax-qualified for that to happen.

**B. *Whether the Millwrights' Plan is subject to, or governed by, ERISA?***

Title I of ERISA

shall apply[, in its entirety,] to any employee benefit plan if it is established or maintained—

> (1) by any employer engaged in commerce or in any industry or activity affecting commerce; or

> (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or

> (3) by both[,]

9. Another explanation as to why the *Shumate* Court may have continually referred to an "ERISA-qualified" plan without necessarily intending to declare that, henceforth, only interests in plans that are both tax-qualified and subject to ERISA may be excluded pursuant to § 541(c)(2), is simply that the plan at issue in *Shumate* was tax-qualified, see *Shumate*, 504 U.S. at 755, 112 S.Ct. at 2245 ("The Plan . . . qualified for favorable tax treatment under the Internal Revenue Code"), and the Supreme Court saw little, or no, harm in referring to it as "ERISA-qualified."

10. This Court disagrees with plaintiff that the Third Circuit would rule, either in this case or in any subsequent case, that an interest in a pension plan that is subject to, or governed by, ERISA, and which also contains an anti-alienation clause as required pursuant to ERISA § 206(d)(1), must

also be tax-qualified in order for it to be excluded from property of a bankruptcy estate pursuant to § 541(c)(2). This Court's conviction in this regard is not affected in the slightest by the chance that the Third Circuit in *Velis v. Kardanis*, 949 F.2d 78 (3rd Cir.1991), may have implied that an "ERISA-qualified" plan is one that is tax-qualified in addition to being subject to ERISA because, even if the Third Circuit did imply as much in *Velis*, this Court could then distinguish *Velis* on the basis that the Third Circuit therein was not faced with the issue of, and thus necessarily did not resolve, whether a debtor can exclude from a bankruptcy estate an interest in a plan that (a) contains an anti-alienation clause as required pursuant to ERISA § 206(d)(1), (b) is subject to ERISA, but (c) *nevertheless is not "ERISA-qualified."*

ERISA § 4(a), 29 U.S.C.A. § 1003(a) (West 1999), and (b) if said plan is not one of the types enumerated in ERISA §§ 4(b), 201, 301, or 401, 29 U.S.C. §§ 1003(b), 1051, 1081, or 1101. *See Id.* The Millwrights' Plan clearly was established and maintained by both an employer, as that term is defined in ERISA § 3(5), 29 U.S.C. § 1002(5), and an employee organization, as that term is defined under ERISA § 3(4), 29 U.S.C. § 1002(4). Additionally, the Millwrights' Plan does not constitute one of the types enumerated in ERISA §§ 4(b), 201, 301, or 401. Therefore, the Millwrights' Plan is subject to, or governed by, Title I of ERISA provided that it is an "employee benefit plan" as that term is defined in ERISA.

"The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan ...." ERISA § 3(3), 29 U.S.C.A. § 1002(3) (West 1999). Thus, the Millwrights' Plan is an employee benefit plan under ERISA if it is either an employee welfare benefit plan or employee pension benefit plan. Although the Millwrights' Plan is clearly not an employee welfare benefit plan as that term is defined in ERISA § 3(1), 29 U.S.C. § 1002(1), the Court concludes that the Plan meets the definition of an employee pension benefit plan. ERISA defines

> the terms "employee pension benefit plan" and "pension plan" [to] mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA § 3(2)(A), 29 U.S.C.A. § 1002(2)(A) (West 1999).

The Millwrights' Plan, by several of its express terms, both provides retirement income to employees participating in the Plan and results in a deferral of income by the same employees for periods extending to the termination of their covered employment. *See* Meinen's Appendix A, Millwrights' Plan Document, Art. II at 3 (expressly declaring that "[t]he primary purpose of the ... [Plan] is to encourage and assist Employees in providing funds for old age security"); Option 2 of Article VI, § 6.7(a) at 17–18 (expressly providing for a deferral of income until a participating employee's severance of employment by reason of, *inter alia,* retirement). On the basis of these express terms, the Millwrights' Plan is an employee pension benefit plan. *See Simpson v. Ernst & Young,* 879 F.Supp. 802, 815 (S.D.Ohio 1994); *Commercial Mortgage Insurance, Inc. v. Citizens National Bank of Dallas,* 526 F.Supp. 510, 515 (N.D.Tex.1981); Ronald J. Cooke, *ERISA Practice and Procedure,* vol. 1, § 2:4 at 2–7 (CBC 1996). It also matters not that employees participating in the Millwrights' Plan have the option of withdrawing employer contributions from the Plan prior to either their retirement or termination of covered employment because (a) "the fact that some money in the [participating employees'] account[s] is accessible does not mean that the Plan is not covered by ERISA," *Spitz v. Berlin Industries, Inc.,* 1994 WL 48593 at *3 (N.D.Ill. 1994); *see also Commercial Mortgage Insurance,* 526 F.Supp. at 515 (it matters not that other reasons may motivate the establishment of a plan provided "that the stated purpose of the ... plan is to provide retirement benefits at some point to the participants"), and (b) the Plan, most importantly, nevertheless systematically defers payment of deferred compensation until participating employees' termination of covered employment since said employees, by virtue of federal income tax penalties for such early withdrawals, *see* IRC § 72(t) (West 1998), are generally biased towards deferring receipt of said compensation until they either separate or retire from employ-

ment. *See* Peter J. Wiedenbeck, *ERISA's Curious Coverage,* 76 *Wash.U.L.Q.* 311, 336 (1998). The Millwrights' Plan is also an employee pension benefit plan under ERISA notwithstanding the Plan's designation of itself as a profit-sharing plan because (a) profit-sharing plans are a type of defined contribution plan, *see Commercial Mortgage Insurance,* 526 F.Supp. at 515, and (b) ERISA describes defined contribution plans as pension plans. *See* ERISA § 3(34), 29 U.S.C.A. § 1002(34) (West 1999); *Commercial Mortgage Insurance,* 526 F.Supp. at 515.

■ Additionally, the Court rejects outright plaintiff's argument that the Millwrights' Plan is not subject to ERISA because the Plan is not also tax-qualified. Although the Court, for reasons that will be discussed subsequently, disagrees that the Plan is not tax-qualified, the Court concludes that the tax status of the Plan is not even relevant to whether the Plan is subject to ERISA because Title I of ERISA applies generally to both tax-qualified plans and those plans that are not tax-qualified. *See* 29 C.F.R. § 2530.200a–1(a) (1998); ERISA §§ 3(1)–(3), 29 U.S.C.A. §§ 1002(1)–(3) (the definitions of "employee benefit plan" or "plan," "employee pension benefit plan" or "pension plan," and "employee welfare benefit plan" or "welfare plan" are not, in any way, predicated upon a plan's tax status); 6 *Stand. Fed. Tax Rep.* (CCH), para. 17,507.13 at 35,065 (1998) ("The[ ] substantive legal requirements [of ERISA] apply to all plans (subject to certain exceptions [not relevant herein]) whether or not they seek tax qualification").

Therefore, the Court holds that the Millwrights' Plan is (a) an employee pension benefit plan, (b) consequently subject to, or governed by, ERISA, and (c) also excluded from the bankruptcy estate of the instant debtor since an interest in a pension plan that is subject to, or governed by, ERISA, and which also contains an anti-alienation clause as required pursuant to ERISA § 206(d)(1), is excluded from property of the bankruptcy estate pursuant to § 541(c)(2) regardless of whether said pension plan is also tax-qualified.

### III.  *Whether the Millwrights' Plan is tax-qualified?*

■ Even though the Court holds that the debtor's interest in the terminated Millwrights' Plan may properly be excluded from property of the debtor's bankruptcy estate pursuant to § 541(c)(2) regardless of whether the Plan meets the IRC's tax qualification requirements, the Court nevertheless also concludes that the Plan meets such tax qualification requirements. Helpful to the Court in drawing this particular conclusion is the fact that the IRS issued favorable determination letters for the Plan (a) on January 5, 1996, in response to Carpenters' September 13, 1995 application for a determination by the IRS that the Plan is tax-qualified, and (b) prior to Carpenters' September 13, 1995 application as evidenced by lines 3(a) and (b) of said application.[11] While "[w]ritten 'determination letters' by the IRS ... 'may not be used or cited as precedent,' ... they are entitled to some weight[, particularly given that t]he force of letters of determination is enhanced by the limited circumstances in which the IRS issues them." *Amato v. Western Union International, Inc.,* 773 F.2d 1402, 1412–13 (2nd Cir.1985). Furthermore, many courts have determined that they should defer to the IRS on issues regarding tax qualification given the complexity of, as well as the IRS' substantial expertise on, such issues. *See In re Youngblood,* 29 F.3d 225, 228–29 (5th Cir.1994); *Kaplan v. First Options of Chicago, Inc.,* 189 B.R. 882, 890–91 (E.D.Pa.1995), *reconsideration denied,* 198 B.R. 91, 92–94 (E.D.Pa.1996); *In re Copulos,* 210 B.R. 61, 64–66 (Bankr.D.N.J.1997). This Court, because it finds persuasive the rationale employed by the courts in the preceding line of cases, will accord substantial

---

11. The Court concludes that the determination letter received by the Plan prior to Carpenters' September 13, 1995 application must have been favorable because, according to line 3a in said application, the Plan now seeks a favorable determination for an amendment after the Plan's initial qualification. The Court can safely presume that the prior determination letter, or prior determination letters, confirmed the Plan's initial qualification.

deference to the IRS' determination letters regarding the instant Plan.

Plaintiff, however, contends that this Court should substantially temper its reliance upon the IRS' determination letter of January 5, 1996, because, according to plaintiff, (a) he has identified several reasons why the Plan is not tax-qualified, and (b) the IRS' review of the Plan that culminated in said determination letter was limited in scope and, thus, the IRS did not consider the aforementioned grounds for disqualification identified by plaintiff. Plaintiff contends that the Plan is not tax-qualified because it impermissibly provides for in-service withdrawals of benefits by employee participants since (a) the Plan, even though it is designated therein as a profit-sharing plan, is, according to plaintiff, actually a money purchase pension plan and relevant tax law provides that in-service withdrawals from a money purchase pension plan are not permitted under any circumstance, and (b) even if the Plan is a profit-sharing plan, the Plan requirements for obtaining said withdrawals are not in accordance with plaintiff's interpretation of relevant tax law. Plaintiff also asserts for the first time in his response to the debtor's partial summary judgment motion that the Plan is not tax-qualified because (a) the Plan, contrary to plaintiff's interpretation of relevant tax law, unconditionally allows a participant to receive his or her entire account balance in the Plan upon (i) said participant's permanent withdrawal from the industry in the geographic area covered by the jurisdiction of the Union, or (ii) termination of the Plan, and (b) in-service withdrawals from the Plan for hardship were, according to plaintiff, granted in contravention of the Plan's hardship withdrawal provisions.

The debtor and Carpenters, on the other hand, while conceding that in-service withdrawals may not be made from a money purchase pension plan, maintain that (a) the Plan is a profit-sharing plan, (b) the Plan, because it is a profit-sharing plan, may provide for in-service withdrawals of benefits to employee participants, and (c) the Plan requirements for obtaining said withdrawals comply with relevant tax law. Because plaintiff's other objections to the Plan's qualifica-

tion status were levied after the debtor moved for, and the debtor and Carpenters filed their briefs in support of, partial summary judgment, the debtor and Carpenters did not respond to said objections. The debtor and Carpenters also did not comment upon plaintiff's contention that the IRS' determination letter and review process were limited in scope such that the determination letter cannot be relied upon by this Court.

For reasons discussed below, the Court determines that it may appropriately and unequivocally rely on the IRS' favorable determination letters regarding the Plan. However, the Court will first address the merits of, and ultimately reject, each of the grounds raised by plaintiff in support of his position that the Plan is not tax-qualified.

### A. Whether the Millwrights' Plan is a profit-sharing plan?

Plaintiff argues that the presence of the requirement in the Collective Bargaining Agreement that participating employers make periodic contributions to the Millwrights' Plan as a percentage of employees' compensation regardless of whether said employers are profitable necessarily prevents the Plan from being a profit-sharing plan. Thus, plaintiff contends that a plan cannot be a profit-sharing plan if it deprives an employer of the discretion to not make plan contributions in an unprofitable year. Plaintiff persists in making this argument notwithstanding the presence of paragraph (27)(A) of IRC § 401(a), which paragraph (a) was added to § 401(a) by amendment in 1986, (b) is entitled "Contributions need not be based on profits," and (c) provides that "[t]he determination of whether the plan under which any contributions are made is a profit-sharing plan shall be made without regard to current or accumulated profits of the employer and without regard to whether the employer is a tax-exempt organization." IRC § 401(a)(27)(A) (West 1998). Plaintiff attempts to reconcile his position with the language of IRC § 401(a)(27)(A) by arguing that § 401(a)(27)(A), while it now allows a profit-sharing plan to authorize discretionary contributions by an employer even in unprofitable years, does not support a profit-sharing

plan provision that mandates contributions by an employer in an unprofitable year. Unfortunately for plaintiff, his position is not supported by any legal authority. More importantly, however, plaintiff's argument fails when one considers the history of legislation and regulatory authority regarding profit-sharing plans.

Prior to July 2, 1956, the Internal Revenue Service's (hereafter "the IRS") regulations defined a profit-sharing plan as "a plan established and maintained by an employer to provide for the participation in his profits, by his employees or their beneficiaries, *based on a definite predetermined formula for determining the profits to be shared ....*" *See* Rev. Rul. 54–51, 1954–1 C.B. 147 (1954) (emphasis added) (citing § 39.165–1(a)(2) of Regulations 118, which was promulgated under the IRC of 1939). Thus, prior to July 2, 1956, an employer who sponsored a profit-sharing plan had absolutely no discretion not only as to the extent to which, but also whether, it would make contributions to its profit-sharing plan. Indeed, if a plan provided an employer with an option to not contribute to said plan at all, then said plan could not be a profit-sharing plan under the IRS' regulations as they existed prior to July 2, 1956, because the amount of profits to be shared necessarily would not be predetermined but would instead be determined after profits had been earned. Of course, prior to the addition of IRC § 401(a)(27)(A) in 1986, an employer could not contribute to a profit-sharing plan at all in the event that it was unprofitable notwithstanding the presence of a definite predetermined contribution formula. *See* H.R. Conf. Rep. No. 99–841, at 485 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4573.

The IRS, on July 2, 1956, amended its regulations by removing the language "based on a definite predetermined formula for determining the profits to be shared." *See* Rev. Proc. 56–22, 1956–2 C.B. 1380 (1956)

(citing T.D. 6189, 1956–2 C.B. 972 (1956), which amended § 39.165–1(a)(2) of Regulations 118 and § 29.165–1(a) of Regulations 111, both of which were promulgated under the IRC of 1939); Tech. Adv. Mem. 68–03–056890A (March 5, 1968); *LTV Aerospace Corporation v. Renegotiation Board,* 51 T.C. 369, 381, 1968 WL 1475 (1968); Treas. Reg. § 1.401–1(b)(1)(ii) (as amended in 1976). Hence, after July 2, 1956, an employer, if a profit-sharing plan so provides, can exercise discretion as to whether, or the extent to which, it will make contributions to a profit-sharing plan. Importantly, however, the IRS' aforementioned regulatory amendment *does not require that a profit-sharing plan must provide an employer with discretion* regarding whether, or the extent to which, it will contribute to a profit-sharing plan; instead, said regulatory amendment *merely permits* a plan to provide an employer with such discretion. Consequently, profit-sharing plans after July 2, 1956, may still require mandatory contributions from employers "based on a definite predetermined formula for determining the profits to be shared." *See, e.g.,* Rev. Rul. 73–147, 1973–1 C.B. 191 (1973) ("Although a qualified profit-sharing plan ... need not contain a definite predetermined formula for determining the profits to be shared with the employees, the plan in this case contained such a formula"); Rev. Rul. 73–535, 1973–2 C.B. 140 (1973) ("The plan provided for annual employer contributions, out of current or accumulated profits, in an amount equal to 15 percent of the participating employees' compensation").[12]

■ With the amendment of, and insertion of the present § 401(a)(27)(A) in, the IRC via the Tax Reform Act of 1986, an employer, for plan years beginning after December 31, 1985, can make contributions to a profit-sharing plan in excess of, or even if said employer is without, profits. *See* IRC § 401(a)(27)(A); H.R. Conf. Rep. No. 99–841, at 485, *reprinted in* 1986 U.S.C.C.A.N. 4075,

---

12. The Court also points out that, if a profit-sharing plan could not potentially require mandatory annual contributions from an employer, then the IRS would not have needed to insert the statement in Treas. Reg. § 1.401–1(b)(2) that, "[i]n the case of a profit-sharing plan[,] ... it is not *necessary* that the employer contribute every year or that he contribute the same amount or contribute in accordance with the same ratio every year." Treas. Reg. § 1.401–1(b)(2) (emphasis added). Thus, this particular regulatory provision implies that a profit-sharing plan potentially can require mandatory annual contributions from an employer.

4573. Because an employer can now make contributions to a profit-sharing plan without any limit as to profits, and since contributions to a profit-sharing plan may still be "based on a definite predetermined formula" (although, of course, a profit-sharing plan may now provide otherwise), see Richard D. Brown, *Pension and Profit Sharing Plans Distinguished*, 340 PLI/Tax 7, 57–58 (1993); Diane E. Burkley & John P. MacDonald, *Defined Contribution Plans*, 385 PLI/Tax 177, 224 (1996); Joyce A. Mader, et al., *ERISA Basics: A Primer on ERISA Issues*, 1997 A.B.A. Cent. Cont. Leg. Ed., it is entirely possible as well as perfectly permissible for an employer to be required to make mandatory contributions to a profit-sharing plan even in the absence of profits. Such a funding scheme, of course, is identical to that which is legally required of a money purchase pension plan. *See* Treas. Reg. § 1.401–1(b)(1)(i) (contributions to a money purchase pension plan must be "fixed without being geared to profits"); Burkley & MacDonald, *supra* p. 384. That the funding scheme for a profit-sharing plan can now mirror that of a money purchase pension plan is evidenced by, and in fact necessitated, Congress' simultaneous enactment, via the Tax Reform Act of 1986, of legislation that can now be found at IRC § 401(a)(27)(B). *See* 6 *Stand. Fed. Tax Rep.* (CCH), para. 17,509.03 at 35,096–97 (1998) ("The elimination of the profit requirement increases the difficulty of distinguishing a profit-sharing plan from a money purchase pension plan ...[; f]or this reason" IRC § 401(a)(27)(B) was enacted). IRC § 401(a)(27)(B) is entitled "Plan must designate type" and provides, in pertinent part, that "[i]n the case of a plan which is intended to be a money purchase pension plan or a profit-sharing plan, ... the plan [must] designate[ ] such intent at such time and in such manner as the Secretary may prescribe." IRC § 401(a)(27)(B) (West 1998). Therefore, a plan is not prevented from being a profit-sharing plan merely because said plan deprives an employer of the discretion to not make plan contributions in an unprofitable year. Consequently, the Plan's status as a profit-sharing plan is not impacted by the fact that the Collective Bargaining Agreement requires participating employers to make periodic contributions to the Millwrights' Plan regardless of whether said contributions are made out of their profits.[13]

Given that the Plan document contains a designation that it is a profit-sharing plan, and because the Court does not detect any legal impediment to the propriety of such designation, the Court concludes that the Plan is a profit-sharing plan. In drawing this conclusion, the Court rejects plaintiff's argument that the Plan document's aforementioned designation does not comply with the Secretary of the Treasury's (hereafter "the Secretary") prescription regarding the time at, and the manner in, which such designation must be made because the Court (a) notes that the Secretary, although entrusted with the authority to prescribe rules regarding said designation, has not yet done so, *see* 6 *Stand. Fed. Tax Rep.* (CCH), para. 17,509.03 at 35,097 (1998), (b) concludes that plan sponsors, therefore, are left to determine for themselves what is a proper method for designating that their plan is a profit-sharing plan, and (c) concludes that the designation of the Plan as a profit-sharing plan in the Plan document is both a reasonable

13. Plaintiff also argues that the Millwrights' Plan cannot be a profit-sharing plan because (a) the Plan is sponsored by multiple employers, and (b) IRC § 401(a)(27)(A) refers to "employer" in the singular, which, according to plaintiff, evidences an intent that plans/trusts created pursuant to collective bargaining agreements and which involve more than one employer cannot constitute profit-sharing plans. The Court rejects this argument summarily and cites as support for its decision (a) IRC § 401(i), which section (i) specifically evidences an intent for the provisions of IRC § 401(a) to apply to multi-employer plans, and (ii) does not preclude multi-employer plans from being profit-sharing plans, *see* IRC § 401(i) (West 1998), and (b) Treas. Reg. § 1.401–1(d), which regulation (i) is entitled "Plan of several employers," and (ii) provides that "[a] trust forming part of a plan of several employers for their employees will be qualified if all the requirements [set forth elsewhere] are otherwise satisfied." Treas. Reg. § 1.401–1(d). *See also* 6 *Stand. Fed. Tax Rep.* (CCH), para. 17,513.02 at 35,115 (1998) ("The fact that Code Sec. 401(a) speaks of a plan 'of an employer' *is not to be taken literally*. The Code *does not require* that each plan be sponsored only by a single employer.").

time and manner in which to provide such a designation.

### B. *Whether the Plan requirements for obtaining in-service withdrawals comply with relevant tax law?*

■ "A profit-sharing plan . . . must provide a definite predetermined formula for . . . distributing the funds accumulated under the plan [ (1) ] after a fixed number of years, [ (2) after] the attainment of a stated age, or [ (3) ] upon the prior occurrence of some event such as layoff, illness, disability, retirement, death, or severance of employment." Treas. Reg. § 1.401–1(b)(1)(ii). Because many of the triggering events for distribution set forth in the aforementioned regulation can occur while a plan participant is still employed, a profit-sharing plan necessarily can provide for in-service withdrawals of accumulated benefits to employee participants. Since the Plan is a profit-sharing plan, it may, and does, provide for in-service withdrawals of benefits accumulated under the Plan. Plaintiff, however, contends that the Plan is not qualified under IRC § 401(a) because, plaintiff asserts, (a) a profit-sharing plan legally cannot, as the Plan concededly does, permit participants to unconditionally withdraw employer contributions even if said withdrawals are confined to employer contributions that were made more than two years prior to said withdrawal, and (b) the Plan provision allowing for withdrawals of employer contributions made within two years of said withdrawal on the basis of hardship is impermissibly liberal. For the reasons set forth below, the Court must reject both of plaintiff's positions.

#### (i) *Whether the Plan may legally permit participants to unconditionally withdraw employer contributions provided that said withdrawals are confined to employer contributions that were made more than two years prior to said withdrawal?*

The Court must conclude, and thus align itself with the position of the debtor and Carpenters, that the Plan may legally permit participants to unconditionally withdraw employer contributions provided that said withdrawals are confined to employer contributions that were made more than two years prior to said withdrawal because (a) Treas. Reg. § 1.401–1(b)(1)(ii) permits a profit-sharing plan to "distribut[e] the funds accumulated under the [P]lan after a fixed number of years," *Id.*, (b) such basis for distribution is independent of other reasons for distribution set forth in Treas. Reg. § 1.401–1(b)(1)(ii), *see Id.* (note the use of the word "or" rather than "and"); 6 *Stand. Fed. Tax Rep.* (CCH), para. 17,509.11 at 35,097 (1998), and (c) the "fixed number of years" referred to in Treas. Reg. § 1.401–1(b)(1)(ii) is two years. *See* Rev. Rul. 71–295, 1971–2 C.B. 184 (1971); Rev. Rul. 68–24, 1968–1 C.B. 150 (1968); Rev. Rul. 94–76, 1994–2 C.B. 46 (1994).

The Court notes several defects in plaintiff's position, two of which can be traced to plaintiff's misinterpretation of Revenue Ruling 71–295. While the IRS concededly held in Revenue Ruling 71–295 that a profit-sharing plan cannot permit unconditional withdrawals of employer contributions only eighteen months after their contribution, *see* Rev. Rul. 71–295, 1971–2 C.B. 184, the IRS in said revenue ruling absolutely did not also hold that a profit-sharing plan cannot permit unqualified withdrawals of contributions accumulated for at least two years. Additionally, the IRS' conclusion in Revenue Ruling 71–295 that "the term 'fixed number of years' is considered to mean at least two years" was clearly made with reference to its own Treas. Reg. § 1.401–1(b)(1)(ii), *see Id.*, which regulation, as explained above, expressly provides that an independent basis for distribution is the accumulation of benefits for a fixed number of years. Therefore, the IRS, by necessary implication, held in Revenue Ruling 71–295 that a profit-sharing plan may permit participants to unconditionally withdraw employer contributions provided that said withdrawals are confined to employer contributions that were made more than two years prior to said withdrawal. The Court also notes that plaintiff's interpretation of Revenue Ruling 71–295 conflicts with the IRS' earlier determination in Revenue Ruling 68–24 that (a) "an event within the meaning of . . . [Treas. Reg. § 1.401–1(b)(1)(ii) ]" is "sixty months of participation under . . . [a profit-sharing] plan," and (b) the withdrawal of

all employer contributions upon the occurrence of said event, without satisfaction of any other condition, is permissible, including employer contributions made within two years of said withdrawal. *See* Rev. Rul. 68–24, 1968–1 C.B. 150; 6 *Stand. Fed. Tax Rep.* (CCH), para. 17,509.11 at 35,097 (1998).

### (ii) *Whether the Plan provision allowing for withdrawals of employer contributions made within two years of said withdrawal on the basis of hardship is impermissibly liberal?*

The Court must also conclude, and thus align itself with the position of the debtor and Carpenters, that the Plan provision allowing for withdrawals of employer contributions made within two years of said withdrawal on the basis of hardship is not impermissibly liberal because (a) Treas. Reg. § 1.401–1(b)(1)(ii) permits a profit-sharing plan to distribute funds "upon the prior occurrence of *some event such as* layoff, illness, disability, retirement, death, or severance of employment," Treas. Reg. § 1.401–1(b)(1)(ii) (emphasis added), (b) "the existence of bona fide hardship is an *event* within the ambit of ... [Treas. Reg. § ] 1.401–1(b)(1)(ii)," Rev. Rul. 71–224, 1971–1 C.B. 124 (1971), (c) a bona fide hardship is one (i) that is defined in a plan document, (ii) for which the rules with respect thereto are uniformly and consistently applied, and (iii) that results in a distribution of employer contributions that does not exceed a participant's vested interest therein, *see Id.,* and (d) the Plan (i) defines five particular circumstances that will constitute a hardship, *see supra* p. 373, (ii) provides for uniform and consistent application of the hardship provisions, and (iii) does not permit hardship withdrawals of employer contributions to which a participant has not yet vested given that participants immediately vest in all employer contributions under the Plan. *See* Meinen's Appendix A, Millwrights' Plan Document, Art. IV, § 4.16 at 12.

The Court notes several defects in plaintiff's position, at least one of which can be traced to plaintiff's misinterpretation of Revenue Ruling 71–224. Plaintiff maintains that,

in order for any profit-sharing plan to be consistent with, or comply with the holding in, Revenue Ruling 71–224, said profit-sharing plan must utilize at least as stringent a definition of the term "hardship" as was used in the plan at issue in said revenue ruling; i.e., "hardship" equals " 'circumstances of sufficient severity that a participant is confronted by present or impending financial ruin or his family is clearly endangered by present or impending want or privation.' " Rev. Rul. 71–224, 1971–1 C.B. 124. In support of his position, plaintiff cites Revenue Procedure 89–14, § 7.01(6), wherein the IRS cautions against reliance by others upon a prior revenue ruling "unless the facts and circumstances [presented in a subsequent case] are substantially the same [as those at issue in the prior revenue ruling]." Rev. Proc. 89–14, 1989–1 C.B. 814 (1989). Unfortunately for plaintiff, the IRS in Revenue Ruling 71–224 did not hold, as a matter of law, that a profit-sharing plan must define the term "hardship" as stringently as did the plan at issue in said revenue ruling. Instead, the IRS in Revenue Ruling 71–224 only held, as a matter of law, that a profit-sharing plan must define the term "hardship," and then operate in accordance with said definition. *See* Rev. Rul. 71–224, 1971–1 C.B. 124; *see also* T.D. 8217, 53 Fed.Reg. 29,658, 29,660 (1988) ("Rev. Rul. 71–224 merely require[s] that a plan operate in accordance with *its definition* of hardship"). Therefore, (a) a profit-sharing plan can be consistent with, or comply with the holding in, Revenue Ruling 71–224 simply by defining the term "hardship," (b) the IRS' aforementioned cautionary statement in Revenue Procedure 89–14, § 7.01(6), is inapplicable to the instant matter given that it matters not (i.e., it is insubstantial) whether a profit-sharing plan's definition of hardship is more or less stringent than that utilized by the plan at issue in Revenue Ruling 71–224, and (c) Revenue Ruling 71–224 thus has substantial precedential value for the debtor and Carpenters in the instant matter.

Of course, the Millwrights' Plan's definition of the term "hardship" must be reasonable and, in particular, reasonable enough so that it can be found to describe an event that will come within the ambit of Treas. Reg. § 1.401–1(b)(1)(ii). However, the Court easi-

ly concludes that the five "hardship" events that are enumerated within the Plan describe events that come within the ambit of Treas. Reg. § 1.401–1(b)(1)(ii) because (a) these five events are identical to the five events (i) which are deemed to constitute hardship events in Treas. Reg. § 1.401(k)–1(d)(2), *see* Treas. Reg. § 1.401(k)–1(d)(2)(ii) (1988), and (ii) upon the occurrence of which an in-service withdrawal from a 401(k) profit-sharing plan may be made, *see* Treas. Reg. § 1.401(k)–1(d)(1)(ii), and (b) even though the hardship withdrawal provisions in Treas. Reg. § 1.401(k)–1(d)(2) only apply to 401(k) profit-sharing plans, these hardship withdrawal provisions are "stricter than those in effect ... under Rev[enue] Rul[ing] 71–224," T.D. 8217, 53 Fed.Reg. at 29,660, which revenue ruling, of course, applies to profit-sharing plans in general. *See also* Brown, *supra* p. 384, at 71 ("The hardship standards [for profit-sharing plans in general] were previously required to be quite succinct to avoid the constructive receipt provisions contained in ... [IRC § ] 402(a). However, the Economic Recovery Tax Act of 1981 deleted the constructive receipt rule," which means that hardship standards for profit-sharing plans can be much less precise now.). Therefore, the Millwrights' Plan's hardship withdrawal provisions are not, in any sense, impermissibly liberal.

### C. *Other objections by plaintiff regarding the tax qualification status of the Millwrights' Plan.*

Plaintiff also asserts that the Plan is not tax-qualified because (a) the Plan, contrary to plaintiff's interpretation of relevant tax law, unconditionally allows a participant to receive his or her entire account balance in the Plan upon (i) said participant's permanent withdrawal from the industry in the geographic area covered by the jurisdiction of the Union,[14] or (ii) termination of the Plan,[15] and (b) in-service withdrawals from the Plan for hardship were, according to plaintiff, granted in contravention of the Plan's hardship withdrawal provisions. The Court concludes that plaintiff (a) is mistaken with respect to the first two assertions, and (b) cannot avoid a grant of summary judgment with respect to the third assertion.

Plaintiff errs in his assertion that the Plan is not tax-qualified because it unconditionally permits a participant to receive his or her entire account balance at the time of said participant's permanent withdrawal from the industry since (a) Treas. Reg. § 1.401–1(b)(1)(ii) permits a profit-sharing plan to distribute funds "upon the prior occurrence of some event such as[, inter alia,] ... *severance of employment,*" Treas. Reg. § 1.401–1(b)(1)(ii) (emphasis added), and (b) such basis for distribution is independent of other reasons for distribution set forth in Treas. Reg. § 1.401–1(b)(1)(ii). *See Id.* Plaintiff is also incorrect in asserting that the Plan cannot be tax-qualified because it unconditionally allows a participant to receive his or her entire account balance in the Plan immediately upon the Plan's termination since (a) IRC § 401(a)(20) expressly permits such distributions, *see* IRC § 401(a)(20);[16] 6 *Stand.*

14. Plaintiff, in both his response to the debtor's partial summary judgment motion and paragraph 34 of his affidavit, raises the issue of whether it is permissible for a Union employee to resign from the Union and, as a consequence, receive immediate payment of his or her entire account balance in the Plan. Because resignation is essentially defined at § 47(B) of the Union's International Constitution as a Union employee's withdrawal from the industry, *see* Healey's Affidavit, para. 34 & Healey's Exhibit L, and since the Plan provides for immediate payment of a participant's Plan account balance without condition upon said participant's permanent withdrawal from the industry in the geographic area covered by the jurisdiction of the Union, see Meinen's Appendix A, Millwrights' Plan Document, Art. VI, § 6.7(a)(2) at 18, the Court rephrases this particular issue as whether such

Plan withdrawal provision precludes the Plan from being tax-qualified.

15. *See* Meinen's Appendix A, Millwrights' Plan Document, Art. IX, § 9.2 at 37, which expressly provides for such a distribution without any other condition.

16. IRC § 401(a)(20) provides, in pertinent part, that:

A trust forming part of a pension plan shall not be treated as failing to constitute a qualified trust under ... [IRC § 401(a) ] merely because the pension plan of which such trust is a part makes 1 or more distributions within 1 taxable year to a distributee on account of a termination of the plan of which the trust is a part, *or in the case of a profit-sharing or stock bonus*

*Fed. Tax Rep.* (CCH), para. 17,906.01 at 35,-500 (1998), and (b)(i) Treas. Reg. § 1.401–1(b)(1)(ii) permits a profit-sharing plan to distribute funds "upon the prior occurrence of some event," Treas. Reg. § 1.401–1(b)(1)(ii), (ii) such basis for distribution is independent of other reasons for distribution set forth in Treas. Reg. § 1.401–1(b)(1)(ii), *see Id.,* and (iii) the Court concludes that the termination of a profit-sharing plan constitutes an "event" within the ambit of Treas. Reg. § 1.401–1(b)(1)(ii).

Finally, the Court must grant partial summary judgment in favor of the debtor notwithstanding plaintiff's broad assertion that in-service withdrawals from the Plan for hardship were granted in contravention of the Plan's own hardship withdrawal provisions because the only specific instances of such impropriety which plaintiff alleges with particularity, and for which he provides any semblance of evidence, are unconditional withdrawals (a) on account of a participant's permanent withdrawal from the industry, (b) upon the Plan's termination, or (c) on October 13, 1997, of all funds then in a participant's account with the Plan that are attributable to employer contributions made before September 30, 1995. *See* Healey's Affidavit, para. 35 & Healey's Exhibit M. Unfortunately for plaintiff, none of these particular types of withdrawals from the Plan contravene the Plan's hardship withdrawal provisions because they are expressly provided for by other provisions of the Plan without any necessity for a demonstration of hardship. Furthermore, none of these particular types of withdrawals negatively impact the Plan's tax-qualification status because they are legally permissible for a tax-qualified profit-sharing plan. In particular, and as explained in the preceding paragraph and footnote 16, unconditional withdrawals on account of a Plan participant's permanent withdrawal from the industry or the Plan's termination are (a) specifically provided for, respectively, at Article VI, § 6.7(a)(2) and Article IX, § 9.2 of the Plan, and (b) legally permitted for a qualified profit-sharing plan pursuant to Treas. Reg. § 1.401–1(b)(1)(ii) and IRC § 401(a)(20), respectively. As for unconditional withdrawals from the Plan on October 13, 1997, of all funds then in a participant's Plan account that are attributable to employer contributions made before September 30, 1995, an amendment of the Plan specifically provides for such withdrawals, *see* Healey's Exhibit M, which withdrawals are legally permissible for a qualified profit-sharing plan in accordance with Treas. Reg. § 1.401–1(b)(1)(ii) and Revenue Ruling 71–295. *See supra* pp. 386–87. To the extent that plaintiff, by broadly asserting that hardship withdrawals from the Plan have been made in contravention of the Plan's own hardship withdrawal provisions, attempts to raise a factual issue regarding other instances of impropriety, he cannot withstand the debtor's partial summary judgment motion because said factual issue is not genuine given that (a) a factual issue is " 'genuine' only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party [i.e., plaintiff herein]," *Hankins v. Temple University,* 829 F.2d 437, 440 (3rd Cir.1987), and (b) plaintiff, except for perhaps several self-serving inferences in his affidavit, has not produced any semblance of evidence to support an allegation of additional impropriety by the Plan vis-a-vis hardship withdrawals.[17]

*plan, a complete discontinuance of contributions under such plan.*
IRC § 401(a)(20) (West 1998) (emphasis added).

17. The Court notes that, even if it were to accept any of the myriad of arguments that plaintiff has advanced in support of his contention that the Millwrights' Plan does not presently satisfy certain of the IRC's tax qualification requirements, the Court still could not summarily "disqualify" said Plan for to do so "would result in [a] violation of the [instant d]ebtor[']s[ ] rights to procedural due process." *Copulos,* 210 B.R. at 65; *see also Youngblood,* 29 F.3d at 228; *Kaplan,* 189 B.R. at 891. Such procedural due process in the instant matter would, at least, take the form of "exhaustion of all administrative remedies within the … [IRS] before any adjudication by th[is] … [C]ourt," *Copulos,* 210 B.R. at 65, as well as the Plan sponsor's opportunity to take advantage of several programs offered by the IRS "under which plan sponsors may correct certain defects[, either form or operational in nature,] and keep their plans qualified." 6 *Stand. Fed. Tax Rep.* (CCH), para. 17,507.19–17,507.195 at 35,-068–72 (1998); *see also Copulos,* 210 B.R. at 65; *Youngblood,* 29 F.3d at 228; *Kaplan,* 189 B.R. at 891. Of course, the instant debtor need not take

**D.** *Whether the Court, in assessing the tax qualification status of the Plan, may appropriately rely on the IRS' favorable determination letters regarding the Plan?*

Even though the Court rejects on the merits each of plaintiff's several grounds in support of plaintiff's position that the Plan is not tax-qualified, the Court holds that it can also appropriately dispose of plaintiff's position by simply relying on the IRS' favorable determination letters regarding the Plan because the Court concludes that the scope of the IRS' review of the Plan that culminated in said determination letters was not limited in the manner asserted by the plaintiff. Instead, the IRS, in the course of its review of the Plan, necessarily dealt with, *inter alia,* the qualification issues raised by plaintiff in his instant complaint. Plaintiff presumes that the IRS' review that culminated in the favorable January 5, 1996 determination letter was solely limited in scope to the Plan's satisfaction of nondiscrimination qualification requirements imposed by legislation collectively referred to as the Tax Reform Act of 1986 (hereafter "TRA") because (a) the IRS, in the January 5, 1996 determination letter itself, stated that said "letter is issued under Rev[enue] Proc[edure] 93–39 and considers the amendments required by ... [TRA]," *see* Meinen's Appendix E, and (b) several portions of Revenue Procedure 93–39 explain that applications for determination letters filed on or after October 12, 1993, will be reviewed by the IRS for compliance with the form and nonform requirements of TRA. *See* Rev. Proc. 93–39, 1993–2 C.B. 513 §§ 3.01 and 4.01 (1993). Plaintiff, however, is mistaken in his presumption because the IRS did *not* proclaim in Revenue Procedure 93–39 that determination letter applications will only be reviewed for compliance with the requirements of TRA. This point is amply evidenced by § 3.011 of Revenue Procedure 93–39, which section plaintiff apparently either overlooks or disregards and which provides, in pertinent part, that:

advantage of such procedural due process since the Court concludes that the Plan is tax-qualified.

**18.** Revenue Procedure 93–6 was updated and superseded by Revenue Procedure 94–6, which

[R]evenue Procedure [93–39] provides supplemental instructions [pertaining to the nondiscrimination qualification requirements imposed by TRA] regarding applications for determination letters on the qualified status of pension, profit sharing, and annuity plans under section 401(a) and 403(a) of the Code that are filed with the Service on or after October 12, 1993.... *The general instructions in Rev[enue] Proc[edure] 93–6 (as modified herein) also continue to apply to all determination letter requests.*

Rev. Proc. 93–39, 1993–2 C.B. 513 § 3.011 (emphasis added) (*see also* § 1.02); *see also* Rev. Proc. 94–6, 1994–1 C.B. 510 § 2.02 (1994) ("Rev. Proc. 93–39 ... sets forth *additional procedures* regarding applications for determination letters on the qualified status of pension, profit-sharing, and annuity plans under section 401(a) or 403(a) of the Code").[18]

"Rev[enue] Proc[edure] 93–6 contains the general procedures of the Service pertaining to the issuance of determination letters on the qualification of pension, profit-sharing, stock bonus, and annuity plans." Rev. Proc. 93–39, 1993–2 C.B. 513 § 2.01; *see also* Rev. Proc. 93–6, 1993–1 C.B. 430 § 1.01 (1993); 6 *Stand. Fed. Tax Rep.* (CCH), para. 17,-507.19 at 35,068 (1998). "A determination letter issued pursuant to ... Revenue Procedure [93–6] contains ... the opinion of the Service as to the qualification of the particular plan involving [each of] the provisions of sections 401 and 403(a) of the Code and the status of a related trust, if any, under section 501(a)." Rev. Proc. 93–6, 1993–1 C.B. 430 § 22.01 (1993) (*see also* § 20.04(1)); *see also* Rev. Proc. 97–6, 1997–1 I.R.B. 153 § 5.02 (1997) ("In general, employee plans are reviewed by the Service for compliance with[, *inter alia,*] the form requirements (that is, those plan provisions that are required as a condition of qualification under § 401(a)).").

Therefore, determination letters by the IRS that are issued under Revenue Procedure 93–39, as well as the reviews by the IRS

in turn has since been updated and superseded by Revenue Procedures 95–6, 96–6, 97–6, and 98–6.

that culminate in such letters, are not confined in scope to merely the nondiscrimination qualification requirements imposed by TRA. Instead, such letters and their corresponding reviews touch upon, *inter alia*, all form requirements necessary for qualification under IRC § 401(a). Among the form requirements necessary for qualification under IRC § 401(a) are (a) the threshold requirement that a plan constitute either a stock bonus, pension, or profit-sharing plan, *see* IRC § 401(a) (flush language preceding paragraph 1), and (b) distribution schemes that satisfy Treasury Regulation § 1.401–1(b)(1)(ii) before a plan can constitute a profit-sharing plan. Consequently, the IRS, by issuing favorable determination letters regarding the Plan, necessarily confirmed that the Plan's (a) characterization and designation of itself as a profit-sharing plan was appropriate, and (b) in-service withdrawal provisions satisfy Treasury Regulation § 1.401–1(b)(1)(ii).

To be accurate, the Court points out that it technically is not relying only on the favorable determination letter issued by the IRS on January 5, 1996, because (a) that letter pertains to Carpenters' September 13, 1995 application, (b) said application only requests a determination by the IRS regarding an amendment to the Plan subsequent to the Plan's initial qualification, (c) "[d]etermination letters issued on amendments to plans and trusts under ... [R]evenue [P]rocedure [93–6] will merely express an opinion whether the amendment, in and of itself, affects the existing status of the plan's qualification and the exempt status of the related trust," Rev. Proc. 93–6, 1993–1 C.B. 430 § 22.02, and (d) the Court is unsure of the substance of the Plan's amendment to which the September 13, 1995 application pertains. Instead, the Court can, and will, also rely on the prior favorable determination letter(s) regarding the Plan [19] because (a) they necessarily confirmed, *inter alia*, that the Plan's (i) characterization and designation of itself as a profit-sharing plan was appropriate, and (ii) in-service withdrawal provisions satisfy Treasury Regulation § 1.401–1(b)(1)(ii), *see supra* p. 390, and (b) the January 5, 1996 determi-

nation letter confirmed that the aforementioned amendment to the Plan did not upset the Plan's status as a tax-qualified profit-sharing plan.

The Court concurs with plaintiff that the Court must temper its reliance upon the Plan's favorable determination letters to the extent that (a) Carpenters[, in its quest to obtain determination letters from the IRS,] has "[f]ail[ed] to disclose a material fact or misrepresent[ed] ... a material fact," Rev. Proc. 93–6, 1993–1 C.B. 430 § 22.01, or (b) a material fact that was disclosed in the determination letter application process has changed, such as via the actual operation of the Plan. *See Id.* However, the only fact that plaintiff alleges Carpenters failed to disclose to the IRS is that the Collective Bargaining Agreement required participating employers to make their periodic contributions to the Millwrights' Plan regardless of whether they operated at a profit, which fact plaintiff asserts prevented the Plan from qualifying as a profit-sharing plan. Unfortunately for plaintiff, the Court, by previously determining that such lack of discretion by the participating employers will not result in a disqualification of the Plan as a profit-sharing plan, *see supra* pp. 383–85, has necessarily also determined that said lack of discretion is a fact not material to the IRS' determination letter inquiry. Therefore, it matters not whether, although the Court points out that it also cannot conclude presently that, Carpenters failed to provide this particular piece of information to the IRS as part of either the September 13, 1995 application or a prior application. Furthermore, the Court has also rejected plaintiff's contention that benefit distributions from the Plan have been made in contravention of the Plan's hardship withdrawal provisions. *See supra* pp. 388–89. Thus, the Court cannot conclude, as plaintiff wishes, that a change has occurred to a material fact that Carpenters disclosed in the determination letter application process. Consequently, the Court finds that it need not temper in any manner its reliance upon the Plan's favorable determination letters.

19. *See supra* p. 382 & n. 11.

Because the Court need not temper in any manner its reliance upon the Plan's favorable determination letters, and since it is appropriate for the Court to accord substantial deference to said determination letters, the Court concludes, on the strength of said letters, that the Plan was, and remains, tax-qualified as a profit-sharing plan pursuant to IRC § 401(a).[20]

## CONCLUSION

With respect to that part of plaintiff's Count I that, pursuant to § 727(a)(5), seeks to deny the debtor his discharge under Chapter 7 the Court **GRANTS** the debtor's summary judgment motion and **DENIES WITH PREJUDICE** plaintiff's similar motion because plaintiff's Count I fails to even state a basis for denial of the debtor's discharge.

Plaintiff's motion to strike Carpenters' *amicus curiae* brief and supporting affidavit is **DENIED WITH PREJUDICE** because (a) Carpenters did not file its *amicus* brief prematurely, (b) Carpenters did not exceed its capacity as *amicus curiae* by filing its supporting affidavit, (c) the participation by Carpenters as *amicus* was not inappropriate even if (i) Carpenters, in its brief, essentially advocated the position taken by the debtor, and (ii) Carpenters attempted to advance its own interests by participating as *amicus,* and (d) plaintiff neither has been, nor will be in the future be, prejudiced by Carpenters' *amicus* brief and supporting affidavit.

With respect to the remaining relief sought by plaintiff in his Count I the Court will **GRANT** the debtor's summary judgment motion and **DENY WITH PREJUDICE** plaintiff's similar motion. The following conclusions by the Court are crucial to the latter decision:

(a) The debtor's interest in the Millwrights' Plan, as a matter of law, may be excluded from property of the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2) even if an ERISA-qualified plan must satisfy all of the requirements for federal tax qualification and the Plan is not tax-qualified, provided that the Plan (a) is subject to ERISA, and (b) contains an anti-alienation clause that satisfies either ERISA § 206(d)(1) or IRC § 401(a)(13)(A).

(b) The Millwrights' Plan is actually subject to ERISA, which means that, consistent with the preceding legal conclusion, the Plan may be excluded from property of the debtor's bankruptcy estate.

(c) The Plan was, and remains, tax-qualified, which means that (a) it is an "ERISA-qualified plan" regardless of how that phrase is defined, and (b) it may be excluded from property of the debtor's bankruptcy estate.

This decision by the Court is appropriate at the summary judgment stage because the Court determines that a genuine issue does not exist as to any material fact, and the debtor, given the Court's legal conclusions, is entitled to judgment as a matter of law.

An appropriate order will be entered.

## ORDER OF COURT

**AND NOW,** this **30th day** of **December, 1998,** upon consideration of (a) Count I of plaintiff's complaint, wherein plaintiff (i) asks that the debtor be denied a discharge pursuant to 11 U.S.C. § 727(a)(5) because, plaintiff asserts, the debtor has failed to explain satisfactorily why the debtor's interest in the

20. Because the Court concludes that the Millwrights' Plan was, and remains, tax-qualified as a profit-sharing plan pursuant to IRC § 401(a), the Court need not address whether plaintiff has standing to challenge the Plan's tax qualification. The Court recognizes that plaintiff appears to possess such standing pursuant to IRC § 7476(b)(1), which grants such standing to "an employee who ... [is] an interested party for purposes of pursuing administrative remedies within the Internal Revenue Service." IRC § 7476(b)(1) (West 1989). However, the Court queries, without deciding, whether IRC § 7476(b)(1) confers such standing upon plaintiff in the instant matter since plaintiff raises his challenge to the Plan's tax qualification not as an employee but rather as a creditor within a bankruptcy case. *See Foy,* 164 B.R. at 598 n. 12 (citing dicta from *In re Swift,* 124 B.R. 475, 485 n. 9 (Bankr.W.D.Tex.1991), to the effect that " 'creditors do not have standing under the tax code to challenge the tax qualification of a plan' "). Furthermore, it is questionable whether plaintiff could challenge the Plan's tax qualification status on behalf of the Chapter 7 trustee. *See Id.; Craig,* 204 B.R. at 760 n. 4.

terminated Millwrights' Local Union No. 2235 Savings Fund (hereafter "Millwrights' Plan" or "Plan") is not available to satisfy the debtor's liabilities, and (ii) seeks a declaration by this Court that the debtor's interest in the Millwrights' Plan constitutes property of the debtor's bankruptcy estate, (b) the debtor's answer to plaintiff's complaint, (c) the parties' motions for summary judgment as to Count I of plaintiff's complaint, as well as their responses thereto, (d) the parties' briefs, affidavits, and supporting exhibits with respect to the summary judgment motions, (e) the *amicus curiae* brief of Carpenters' Combined Funds, Inc., who is the Administrator of the Millwrights' Plan (hereafter "Carpenters"), which brief dealt solely with the issues raised in plaintiff's Count I, and (f) plaintiff's motion to strike Carpenters' *amicus curiae* brief and supporting affidavit; and subsequent to a status conference on the matter held on May 12, 1998, at which time the Court, upon the suggestion of the parties, invited dispositive motions regarding plaintiff's complaint; and in accordance with the accompanying memorandum opinion of this Court dated **December 30, 1998**, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. The debtor's summary judgment motion is **GRANTED** and plaintiff's similar motion is **DENIED WITH PREJUDICE** with respect to that part of plaintiff's Count I that, pursuant to § 727(a)(5), seeks to deny the debtor his discharge under Chapter 7 because plaintiff's Count I fails to even state a basis for denial of the debtor's discharge.

2. Plaintiff's motion to strike Carpenters' *amicus curiae* brief and supporting affidavit is **DENIED WITH PREJUDICE** because (a) Carpenters did not file its *amicus* brief prematurely, (b) Carpenters did not exceed its capacity as *amicus curiae* by filing its supporting affidavit, (c) the participation by Carpenters as *amicus* was not inappropriate even if (i) Carpenters, in its brief, essentially advocated the position taken by the debtor, and (ii) Carpenters attempted to advance its own interests by participating as *amicus,* and (d) plaintiff neither has been, nor will

he in the future be, prejudiced by Carpenters' *amicus* brief and supporting affidavit.

3. The debtor's summary judgment motion is **GRANTED** and plaintiff's similar motion is **DENIED WITH PREJUDICE** with respect to the remaining relief sought by plaintiff in his Count I because:

(a) The debtor's interest in the Millwrights' Plan, as a matter of law, may be excluded from property of the debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2) even if an ERISA-qualified plan must satisfy all of the requirements for federal tax qualification and the Plan is not tax-qualified, provided that the Plan (a) is subject to ERISA, and (b) contains an anti-alienation clause that satisfies either ERISA § 206(d)(1) or IRC § 401(a)(13)(A).

(b) The Millwrights' Plan is actually subject to ERISA, which means that, consistent with the preceding legal conclusion, the Plan may be excluded from property of the debtor's bankruptcy estate.

(c) The Plan was, and remains, tax-qualified, which means that (a) it is an "ERISA-qualified plan" regardless of how that phrase is defined, and (b) it may be excluded from property of the debtor's bankruptcy estate.

4. The Court's decision is appropriate at the summary judgment stage because a genuine issue does not exist as to any material fact, and the debtor, given the Court's legal conclusions, is entitled to judgment as a matter of law.

**IN SUMMARY,** the Court (a) **GRANTS** the debtor's motion for summary judgment on plaintiff's Count I and **DENIES WITH PREJUDICE** plaintiff's similar motion, which means that (i) the debtor's discharge shall not be denied pursuant to § 727(a)(5), and (ii) the debtor is correct in excluding his interest in the Millwrights' Plan from his bankruptcy estate, and (b) **DENIES WITH PREJUDICE** plaintiff's motion to strike Carpenters' *amicus curiae* brief and supporting affidavit.