**In re Joel M. HANDEL, Debtor.**

**No. 01–40758(RDD).**

United States Bankruptcy Court, S.D. New York.

Nov. 17, 2003.

Sanford P. Rosen & Associates, P.C., by Sanford P. Rosen, New York City, Kenneth M. Lewis, White Plains, NY, for Debtor.

Phillips, Lytle, Hitchcock, Blaine & Huber, LLP, by William M. Hawkins and David M. Banker, New York City, for HSBC Bank USA.

*MEMORANDUM DECISION ON HSBC BANK USA'S (1) OBJECTIONS TO PROPERTY CLAIMED AS EXEMPT AND (2) MOTION FOR DETERMINATION THAT SUCH PROPERTY IS NOT EXEMPT*

ROBERT D. DRAIN, Bankruptcy Judge.

HSBC Bank USA ("HSBC") seeks a determination that the interest of Joel M.

Handel in the savings and profit sharing plan established by his former law firm, Baer Marks & Upham LLP ("Baer Marks"), is property of his estate under section 541 of the Bankruptcy Code and is not exempt under section 522 of the Code. Mr. Handel's schedule of exempt assets under Bankruptcy Rules 1007 and 4003(a) ("Exemption Schedule") valued that interest, which he apparently is not currently eligible to receive, at $862,700.[1] Mr. Handel responds that under section 541(c)(2) of the Bankruptcy Code his interest in the savings and profit sharing plan is not property of the estate and that it is, in any event, exempt under section 522(b)(2) and applicable New York law (New York having opted out of the Federal exemption scheme under N.Y. DCL § 284).

HSBC also objects to Mr. Handel's $30,000 exemption with respect to three life insurance policies (the "Insurance Policies") on the basis that his Exemption Schedule did not adequately identify the policies. HSBC's counsel confirmed that HSBC had decided not to pursue its other objections to exemptions raised in its motion.

Based on the testimony and exhibits admitted into evidence, as well as the agreed facts in the parties' Pre–Trial Statement dated July 22, 2003 ("Pre–Tr.St."), I find that Mr. Handel exerted control over his interest in the savings and profit sharing plan in violation of the plan's terms and the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (ERISA) in a manner that would cause the plan, at least as it pertains to Mr. Handel, not to qualify for favorable tax treatment under section 401(a) of the Internal Revenue Code (IRC).

Given the plain language of section 541(c)(2) of the Bankruptcy Code, ERISA and applicable precedent, however, I conclude as a matter of law that such conduct is irrelevant. Mr. Handel's violation of the plan and ERISA did not render any less enforceable the alienation prohibition in the plan and ERISA § 206(d)(1). Accordingly, under section 541(c)(2) of the Bankruptcy Code Mr. Handel's interest in the plan is not property of his chapter 7 estate. Giving Mr. Handel the benefit of a pension plan whose requirements he has disregarded may seem inequitable, but, as currently enacted, ERISA's anti-alienation requirement has no exceptions that are applicable here, and the Supreme Court has refused to graft any equitable exceptions onto the statute.[2]

With regard to the second issue, Mr. Handel sufficiently identified the Insurance Policies on his Exemption Schedule. As neither the chapter 7 trustee nor any other party in interest, including HSBC, sought additional information about the Policies or raised any other objection, the exemption stands.

*Facts*

Effective January 31, 1985, Baer Marks adopted a savings and profit sharing plan. The parties have agreed that the plan's governing instrument for the period February 1, 1989 through February 1, 1998 is the amendment and restatement of Baer Marks & Upham Savings & Profit Sharing Plan dated January 31, 1995 (the "Plan"). Pre–Tr.St. ¶ 19.

---

1. HSBC obtained a $1,962,102.83 judgment against Mr. Handel on August 9, 1993, of which more than $1 million remains unpaid.

2. Nevertheless, I have made findings regarding the extent of Mr. Handel's control over his interest in the plan so that if, in the light of the seemingly inequitable result of this decision, there is a basis for disagreeing with my interpretation of the relevant statutes, the results of the hearing will not be lost.

Mr. Handel is an experienced corporate lawyer. He was a partner in Baer Marks or its predecessor from 1976 through 2001, when the firm dissolved, and he was a managing partner or a member of Baer Marks' managing committee from 1977 through 2001. *Id.* ¶¶ 11–13. Bear Marks is a mid-size New York law firm; from 1992 through 1997, Bear Marks had between 27 and 33 partners. *Id.* ¶ 16.

Mr. Handel was never officially a trustee of the Plan or a member of the Administrative Committee that served as Plan Administrator, but he had access to the terms and conditions of the Plan and testified that he gave a copy of the Plan to his broker/financial consultant when he applied to establish Plan accounts at Salomon Smith Barney, Inc. ("Smith Barney"). He actually executed the Plan on behalf of Baer Marks. *Id.* ¶ 20.

The Plan was drafted to be subject to ERISA[3] and to qualify for favorable tax treatment under section 401(a) of the IRC.[4] Plan at 1. Eric Martins, a Baer Marks partner and one of the Plan's three trustees, testified that he believed the Plan met the requirements of ERISA. The Plan limits the maximum annual additions to a member's Plan assets (Plan § 3.11) (*see* 26 U.S.C. §§ 401(a)(16), 415(c)); provides that the Plan trustees shall invest and distribute the Plan assets, which are held in trust, although members may direct investments within separate funds, or Individual Accounts, maintained in trust by the Plan (Plan §§ 4.1–4.3) (*see* 29 U.S.C. §§ 1103(a), (c), 1104(c)); contains an anti-alienation, or spendthrift provision (Plan § 6.9) (*see* 29 U.S.C. § 1056(d)(1); 26 U.S.C. § 401(a)(13)(A));[5] limits Plan withdrawals by members (Plan § 8.1) (*see* 29 U.S.C. § 1106(b)(1); 26 U.S.C. § 401(a)(19)); limits and prescribes the types of loans that can be made to beneficiaries by the Plan (Plan § 8.3) (*see* 29 U.S.C. §§ 1056(d)(2), 1104(c), 1106(a)(1)(B), 1108(b)(1); 26 U.S.C. §§ 401(a)(4), (5), (10)(A), (19) 4975(a), (c)); and provides for adjustments if the Plan becomes "top heavy"—that is, if Plan Account Values are too heavily weighted in favor of Key Employees. (Plan Art. 13) (*see* 26 U.S.C. §§ 401(a)(10)(B), 416(a)).

Not only was the Plan drafted to be subject to ERISA and receive favorable tax treatment, but Baer Marks also sought and obtained two letters, dated January 9, 1987 and January 30, 1996, respectively, in which the IRS determined that the Plan was qualified under IRC § 401(a). The evidentiary effect of these letters is significantly weakened, however, by their statement that they are "based on the information supplied," and that information, such as Baer Marks' applications to the IRS, is not in the record. It is not clear, but highly doubtful, that Baer Marks informed the IRS of Mr. Handel's conduct, discussed below, with respect to his interest in the Plan. Further, each IRS determina-

3. *See* 29 U.S.C. §§ 1002(2)(A) (defining "pension plan"); 1003(b) (listing five types of plans excepted from title I of ERISA, none of which resemble the Plan).

4. 26 U.S.C. § 401(a) sets forth the requirements for a "qualified trust" forming part of an employee pension plan to be entitled to favorable tax treatment.

5. Section 6.9 of the Plan states,
*Spendthrift Provision.* No benefit payable under the Plan will, except as otherwise specifically provided by law, be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to so anticipate, alienate, sell, transfer assign, pledge, encumber or charge the same will be void; nor will any benefit be in any manner liable for or subject to the debts, contracts, liabilities, engagements or torts of the person entitled thereto.

tion letter states that qualification for favorable tax treatment does not depend solely on the Plan's language: "Continued qualification of the plan will depend on its effect *in operation* under its present form." (Emphasis added.)

Mr. Handel testified that his Individual Account (that is, his Plan assets) comprised only brokerage accounts at Smith Barney (the "Brokerage Accounts"), an investment in Josh Baer Fine Arts Associates LP ("Josh Baer") and a life insurance policy (the "MetLife Policy") issued by Metropolitan Life Insurance Company. Pre–Tr.St. ¶ 30.[6]

Mr. Handel exerted control over these assets contrary to the requirements of the Plan, ERISA and IRC § 401(a).

First, although he was not officially named a trustee of the Plan, Mr. Handel dealt with Smith Barney as if he was. For example, when he established a Brokerage Account, Mr. Handel executed a Smith Barney New Account Application in several places as "Trustee" and once as "TTEE"[7] of a Baer Marks plan in which he also described himself as the "Plan Participant." Mr. Handel contends he was required to execute the Application in this manner to receive Smith Barney's authorization to direct investments in the Brokerage Account. (The direction of investments *within* an Individual Account by a beneficiary of the Plan is permissible under the Plan and ERISA; the free transfer by beneficiaries of funds and investments *in and out* of Individual Accounts is

not.)[8] However, Brian Jenkins, a senior operations manager responsible for the day-to-day operation of the Smith Barney branch where the Brokerage Accounts were kept, testified that by identifying himself as the "Trustee," Mr. Handel would have given himself greater authority over the Account than simply the ability to direct investments within it. According to Mr. Jenkins, Smith Barney would have treated the person listed as the "trustee" of an account for a savings and profit sharing plan, such as the Plan, as the only person with unfettered power to direct deposits into and withdrawals out of the account.

Mr. Jenkins contrasted the Brokerage Account listed on the Application with a "self-directed account," a type of account that Smith Barney also administers and which Mr. Handel has argued the Brokerage Accounts really were. According to Mr. Jenkins, Smith Barney's "self-directed accounts," while letting the owner direct investments within the account, do not permit the owner to make withdrawals freely from the account. According to Mr. Jenkins, the Application under which Mr. Handel established the Brokerage Account as "Trustee" was not for a "self-directed account" but, rather, for an "ERISA account," and, therefore, Smith Barney would have treated the "Trustee" identified on the Application as the trustee of the assets in the plan identified on the Application, not merely as the participant in a self-directed account.[9]

**6.** HSBC disputes that the Plan owns the MetLife Policy and the Josh Baer investment, rather than being owned by Mr. Handel personally.

**7.** HSBC also introduced Smith Barney client statements for the Brokerage Accounts, received by Mr. Handel, listing Mr. Handel as the "TTEE" or "TRS" of the Accounts. Mr. Jenkins confirmed that "TTEE" or "TRS"

means "Trustee" for Smith Barney's purposes.

**8.** 29 U.S.C. §§ 1103(a), 1104(c).

**9.** The Brokerage Account Application itself appears to treat a "trustee" and a "plan participant" the same with respect to transactions "in" the account. Its signature page,

It is possible, of course, that Smith Barney required Mr. Handel to sign the wrong form in the wrong way, as Mr. Handel argues (Pre–Tr.St.¶ 35), but there is no evidence to support this contention with the exception of Mr. Handel's testimony that he knew who the trustees of the Plan were and did not intend to represent that he was one of them, and the latter statement was not credible in the light of the executed forms themselves and Mr. Handel's legal expertise. In this regard, Mr. Handel testified that one of his closest friends, Jay Feder, was the Smith Barney broker/financial advisor who forwarded him the Application and set him up in the Brokerage Accounts (see also Pre–Tr.St. ¶¶ 25, 27), yet Mr. Feder did not testify at the hearing. Nor did Mr. Handel otherwise rebut Mr. Jenkins' testimony that Mr. Handel gained full control over the Brokerage Accounts by designating himself to Smith Barney as the Plan's trustee.

The record reflects, therefore, that Mr. Handel represented himself to Smith Barney as the trustee of the Plan and thereby gained the ability to control his interest in the Plan, contrary to the Plan and 29 U.S.C. §§ 1103(a) and 1104(c) and 26 U.S.C. § 401(a).

Mr. Handel used that freedom to withdraw substantial sums from the Brokerage Accounts, although he disputes whether such withdrawals constituted anything more than the shifting of one investment in the Plan to another, which is permitted by ERISA.

Thus, Mr. Handel admitted that in 1993 and 1994 he withdrew approximately $90,000 to $95,000 in the aggregate from the Brokerage Accounts to pay some of his debts, most or all of which, he testified, had been incurred during the extensive renovation of his "white glove" (Pre–Tr.St. ¶ 9) Park Avenue apartment. In the Pre–Trial Statement, Mr. Handel acknowledged that the withdrawn amount actually was higher: "$20,000 during 1993 and $95,500 during 1994" (Pre–Tr.St.¶ B(2)(l )), for a total of $115,500, or approximately 13 percent of the value of his interest in the Plan set forth on his Exemption Schedule.

To corroborate Mr. Handel's practice of making withdrawals from the Brokerage Accounts, HSBC introduced a $25,000 third party Smith Barney check issued to I. Mass & Sons, Inc., a company identified by Mr. Handel as one of the contractors who worked on his apartment renovation. A Smith Barney record dated May 25, 1994 states that the check was issued for "Joel Handel TRS Baer Marks & Upham" and that the "Check will be messengered over. From Joe Handel TRS." Mr. Jenkins testified that Smith Barney would require a plan trustee's authorization before issuing such a third party check.

Although Mr. Handel asserted that these withdrawals were permissible loans to him by the Plan, in no respect do they comply with the Plan's requirements for permissible loans to beneficiaries. In fact, they bear none of the indicia of loans. There is no loan application or any other documentation. Mr. Handel testified that he has a vague memory of a draft security

under the handwritten heading "Baer Marks & Upham Joel Handel TTEE 401K" states, You [Smith Barney] may accept orders for transactions in this account from any named trustee or duly appointed investment manager, advisor, or if a self-directed participant account, the plan participant who may act singly unless otherwise indicated.

(Emphasis added.) Thus, simply by reading the form it should have been clear to Mr. Handel that he did not have to list himself as a "trustee" merely to be able to direct investments "in" the Brokerage Accounts.

agreement in connection with some or all of the withdrawals, but acknowledged that he was unable to locate any draft documentation, let alone an executed agreement. There is no note, no book entry and, with two exceptions discussed below, no other memorialization that any withdrawal from the Brokerage Accounts was a loan to Mr. Handel.

In contrast, the Plan has a detailed procedure for extending credit to Plan beneficiaries and details the permissible form of Plan loans. Under section 8.3 of the Plan, "a loan program with uniform and non-discriminatory rules shall be administered by the Plan Administrator...." Plan § 8.3. The loan application must specify the amount of the loan sought, and "any loan granted shall: (a) bear a rate of interest as determined by the [trustees] as of the date the loan was made, (b) be self-amortizing and repaid, pursuant to a fixed repayment schedule ... in any event within five years from the date of the loan ... and (c) be secured by one-half (½) of the Member's vested Individual Account." *Id.*[10] "Loan repayments will be made pursuant to a negotiable promissory note which may be incorporated into the loan documents." *Id.* Further, any loan made by the Plan must be "under terms generally comparable to those that would be available from commercial lending institutions under similar circumstances as determined in the sole discretion of the [trustees], provided the requirements of this Section 8.3 are met." *Id.* Section 8.3 also caps the principal amount of any loan from the Plan at $50,000.

There is no evidence that Mr. Handel complied with any of these procedures and

requirements in connection with any withdrawals from the Brokerage Accounts. Indeed, the only evidence that any of the withdrawals were treated as loans are the Plan's annual Return/Reports of Employee Benefit Plan, IRS Form 5500, for fiscal years 1994 and 1995 dated January 31, 1995 and January 31, 1996, respectively (the "Returns"). Each Return has an attachment (each an "Attachment"), responsive to the request on line 27A for identification of the Plan's loans receivable, which states that the Plan has a $45,414 loan receivable from Mr. Handel with an interest rate of 9.5% and a January 1, 2000 maturity date.

Neither Mr. Martins nor William Norden (a Baer Marks partner and the other Plan trustee who testified at the hearing) knew who prepared the Returns or, more importantly, the Attachments. Consequently, notwithstanding that the Returns otherwise met F.R.E. 803(6), there were serious hearsay problems with the Attachments, particularly given their opinion nature and the untrustworthiness of the circumstances of their preparation (there being no reliable testimony about (a) whether they were prepared by outside auditors, in-house staff or someone else or (b) what the Attachments were based on, given that they clearly were not based on any other documents in the record).

The Attachments also are subject to question for other reasons. Although Mr. Handel made deposits into the Brokerage Accounts in excess of Baer Marks' Plan contributions that conceivably could have been partial loan payments, those deposits do not come close to reflecting the reduction of a $115,500 "loan receivable" (the

---

**10.** Mr. Martins testified that the Plan trustees instituted procedures to enforce the foregoing requirements. If a member wanted to borrow from the Plan, a benefits specialist would have required that a loan application be completed, an analysis of the applicant's account conducted, payment terms and an interest rate negotiated, and loan documentation executed and kept on file.

amount Mr. Handel admits he withdrew from the Brokerage Accounts), or anything like that amount, to a $45,414 "loan receivable." Similarly, the Brokerage Account records do not reflect self-amortizing principal reductions, as required by the Plan, or regularly scheduled 9.5 percent interest payments. Finally, the fact that $45,414 ostensibly remained the outstanding balance of the purported loan between the end of fiscal year 1994 and fiscal year-end 1995 suggests that this was not a self-amortizing loan as required by the Plan. I therefore admitted the Returns, including the Attachments, as evidence of the Plan's tax records but not as to the truth of the Attachments' representation that the Plan actually had a loan receivable from Mr. Handel. *See* F.R.E. 803(6) (business record exception may not be applied if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness").

As noted above, the record also shows that Mr. Handel made numerous cash deposits into the Brokerage Accounts in excess of the amount permitted by the Plan and IRC § 401(a) as then in effect, *see* 26 C.F.R. § 1.415–9(a)(1), and these amounts do not correspond to scheduled amortization payments or payments of interest on the purported loan by the Plan to Mr. Handel or the payments necessary to reduce a $115,500 principal balance to $45,414. It appears, instead, that Mr. Handel simply was making additional deposits into the Accounts.

The record shows, therefore, that Mr. Handel pulled money out of his Brokerage Accounts and put money into them as was convenient for him, without treating the withdrawals as loans in compliance with the Plan, ERISA or IRC § 401(a), after ensuring his ability to do so by falsely representing to Smith Barney that he was the Plan's trustee. The Plan trustees permitted Mr. Handel to exercise such control, contrary to the terms of the Plan, and, as shown by the Attachments, it is reasonable to infer that they knew Mr. Handel withdrew money from the Plan in derogation of the Plan, ERISA and IRC § 401(a).

In addition to the $115,500 of withdrawals discussed above, Mr. Handel (again representing himself to be the "trustee of the above referenced plan" ("Joel Handel Trustee, Baer Marks & Upham Profit Sharing Plan FBO Joel M. Handel Account Number 401–03316–11")) in a November 17, 1997 letter to Mr. Feder directed the issuance of a $28,950 check payable to MetLife for a premium payment on the MetLife Policy. Smith Barney issued the check two days later for the benefit of "Joel Handel TTEE Baer Marks & Upham." Mr. Handel acknowledges that two other $28,950 MetLife Policy premium payments also came from the Brokerage Accounts. Pre–Tr.St. ¶ B(2)(1).

This would be fairly innocuous (although another misrepresentation of Mr. Handel's authority with respect to the Plan), if it were clear that the MetLife Policy was and would remain a Plan asset, but that is not the case. The MetLife Policy states that the *owner* of the Policy (which was on the life of Mr. Handel, as the insured, in the face amount of $1 million) is "Joel Handel Trustee." If it suited him, therefore, Mr. Handel could have argued to Smith Barney that he alone controlled the Policy. In the space designating the *beneficiary* of the MetLife Policy, the Policy directs the reader to "See Application for Contingent Beneficiary." Paragraph 16 of that application identifies the "Revocable Beneficiary" of the Policy "(unless otherwise designated)" as the "Trustees of Baer Marks & Upham Savings Plan FBO Joel M. Handel." At first glance, therefore, the beneficiary of the MetLife Policy appears to be

the Plan, apparently properly identified by generic reference to the Plan's trustees. On inspection, though, the MetLife Policy is ambiguous; although it carries the signature of two of the actual trustees of the Plan, Mr. Martins and Donald Bezahler, it lists the beneficiary's address as "875 Park Avenue, NY, N.Y. 10022"—Mr. Handel's address (Pre–Tr.St.¶ 9)—rather than the address of Baer Marks. In addition, a "Tax Qualified Pension Plan Fact Sheet" dated between the date of the Application and the date of the MetLife Policy, although signed by Mr. Martins as "trustee" (on a line on which Mr. Handel's signature has been scratched out), also twice identifies Mr. Handel as the "trustee" of the Plan. Moreover, a "MetLife Brokerage Commission Disclosure Form" of the same date lists Mr. Martins as "Trustee # 1" and Mr. Handel as "Trustee # 2" of the Plan (Pre–Tr.St.¶ 39).[11]

The Application Form also identifies the Plan only as the *"revocable"* beneficiary of the Policy. As set forth on page 9 of the Policy, "You [the Owner: 'Joel Handel Trustee'] may change the owner, contingent owner, *beneficiary* or contingent beneficiary of this policy by written notice or assignment of the policy.... Your policy [also] may be *assigned* as collateral." (Emphasis added.). Therefore, whether by design or sloppiness—and Mr. Handel's long experience as a corporate attorney belies sloppiness—Mr. Handel maintained a significant measure of control, in derogation of 29 U.S.C. §§ 1056(d)(1), 1103 and 1104 over the disposition of his second largest Plan asset, the MetLife Policy, and

the Plan trustees knew or reasonably should have inferred that Mr. Handel maintained such control.

### Discussion

I. *Jurisdiction.* This is a core proceeding under 28 U.S.C. § 157(b)(2)(B),[12] and the Court has jurisdiction under 28 U.S.C. § 1334(b).

■ Mr. Handel argues, nevertheless, that because this ruling addresses the Plan and yet neither the Plan, its trustees nor any of its other beneficiaries are before the Court, the Court either lacks the power to decide this proceeding or should exercise discretion not to do so. He also suggests that the Court must or should defer to the IRS regarding whether the Plan complies with IRC § 401(a). Given section 541(c)(2) of the Bankruptcy Code and 28 U.S.C. § 157(b)(2)(B), however, while this Court perhaps "is not competent to determine whether or not the ERISA-qualification should be revoked or terminated for non-compliance for purposes of the Internal Revenue Code, it is certainly competent to determine whether or not the Plan under consideration is ... excluded from the Debtor's estate by virtue of § 541(c)(2)." *In re Harris,* 188 B.R. 444, 449 (Bankr.M.D.Fla.1995), *aff'd Harris v. Jensen,* 116 F.3d 1492 (11th Cir.1997), *cert. denied,* 522 U.S. 950, 118 S.Ct. 370, 139 L.Ed.2d 288 (1997). As discussed, below, that analysis may lead to deference to IRS determinations but, as here, such deference is not required. *See, e.g., In re Meinen,* 228 B.R. 368, 390–92 (Bankr. W.D.Pa.1998); *In re Feldman,* 171 B.R.

---

11. A "2000 Restatement Form" dated November 7, 2000 regarding the MetLife Policy is, on the other hand, signed by Mr. Handel only in his capacity as the insured and is executed by Mr. Bezahler, in his capacity as trustee of the Plan, as "Owner or Absolute Assignee," but I do not ascribe much weight to this *postpetition* document.

12. 28 U.S.C. § 157(b) provides, "(2) Core proceedings include, but are not limited to—(B) allowance or disallowance of claims against the estate or exemptions from property of the estate...."

731, 732 (Bankr.E.D.N.Y.1994) (exemption litigation temporarily stayed while awaiting IRS determination of qualification under IRC § 401(a)).

II. *Exclusion from the Estate.* Section 541(a)(1) of the Bankruptcy Code broadly defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case," but it is subject to the exception contained in section 541(c)(2) of the Bankruptcy Code, which provides that "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2).[13] The first and perhaps only issue, therefore, is whether Mr. Handel's beneficial interest in the Plan is not property of his chapter 7 estate, in which case that interest is free from the claims of his creditors in this chapter 7 case; the secondary issue, whether his Plan interest is exempt under section 522 of the Bankruptcy Code, need be considered only if it is determined that his interest in the Plan is estate property. *In re Harris,* 188 B.R. at 447.

In *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the Supreme Court resolved a conflict among the Courts of Appeal over whether a debtor's interest in a corporate pension plan that "satisfied all applicable requirements of [ERISA] and qualified for favorable tax treatment under the [IRC]" was excluded from his estate under section 541(c)(2) of

the Bankruptcy Code. *Id.* at 755, 112 S.Ct. 2242. The Court noted that 29 U.S.C. § 1056(d)(1) requires that "each pension plan shall provide that benefits provided under the plan may not be assigned or alienated," *id.* at 759–60, 112 S.Ct. 2242,[14] and further noted that the anti-alienation requirement of section 1056(d)(1) is enforceable under 29 U.S.C. § 1332(a). *Id.* at 760, 112 S.Ct. 2242. Given that ERISA also states that such assets are held in trust, 11 U.S.C. § 1103, the plain meaning of section 541(c)(2) required, therefore, that "a debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to § 541(c)(2)." *Id.* at 765, 112 S.Ct. 2242.

In so holding, the Court elaborated on two policies. Noting that "[w]e previously have declined to recognize any exceptions to ERISA's antialienation provision *outside* the bankruptcy context," *id.* at 764, 112 S.Ct. 2242 (emphasis in the original), citing *Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), the Court reasoned that the policy of ensuring the protection of pension benefits from creditors should not depend on the beneficiary's bankruptcy status. *Id.* "Declining to recognize any exceptions to that provision *within* the bankruptcy context minimizes the possibility that creditors will engage in strategic manipulation of the bankruptcy laws in order to gain access to otherwise

---

13. *But see Robbins v. DeBuono,* 218 F.3d 197, 203 (2d Cir.2000), *cert. denied Novello v. Robbins,* 531 U.S. 1071, 121 S.Ct. 760, 148 L.Ed.2d 662 (2001) (ERISA's anti-alienation provision protects benefits only while held by plan administrator and not after they reach the beneficiary's hands). Creditors' ability to reach former ERISA plan assets after they have been distributed is relevant here because the Court previously entered an order denying Mr. Handel's discharge.

14. The anti-alienation requirement of ERISA § 209(d) applies to plans, like the Plan, covered by title I of ERISA although not to all plans covered by other sections of ERISA. *See* Litman, "Bankruptcy Status of 'ERISA Qualified Pension Plans'—an Epilogue to *Patterson v. Shumate,*" 9 Am. Bankr.Inst. L.Rev., 637, 655–663 (2001) (hereafter, *"Litman"*).

inaccessible funds." *Id.* (emphasis in the original).

The Court then observed that "Our holding also gives full and appropriate effect to ERISA's goal of protecting pension benefits." *Id.* Noting that it had recently declined to impose a constructive trust on the pension benefits of a corrupt union official in *Guidry,* notwithstanding strong equitable considerations to the contrary, the Court stated that the congressional policy of protecting pension benefits applied with equal, if not greater, force in the present context:

> Section 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task.

*Shumate,* 504 U.S. at 765, 112 S.Ct. 2242, quoting *Guidry,* 493 U.S. at 376, 110 S.Ct. 680.

Unfortunately, however, disputes over how to construe *Shumate* have bedeviled later cases and limited the force of the policies described above. Two such disputes pertain to HSBC's motion.

A. *A Plan Subject to ERISA or a Tax–Qualified Plan?* By referring to an "ERISA-*qualified*" plan, 504 U.S. at 759, 765, 112 S.Ct. 2242, and noting that "[t]he coordinate section [to 29 U.S.C. § 1056(d)(1)] of the Internal Revenue Code, 26 U.S.C. § 401(a)(13), states as a general rule that '[a] trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated,'" *id.* at 759, *Shumate* left open some uncertainty over whether, to comply with section 541(c)(2) of the Bankruptcy Code, a plan whose anti-alienation provision is enforceable under ERISA must also be "qualified" for favorable tax treatment under IRC § 401(a). (There is no such thing as an "*ERISA*-qualified" plan; there are "qualified trusts" entitled to favorable tax treatment under IRC § 401(a).) *Compare In re Hall,* 151 B.R. 412, 419–20 (Bankr. W.D.Mich.1993) (plan must be "tax-qualified" under IRC § 401(a), in addition to containing an anti-alienation provision that is enforceable under ERISA, to satisfy section 541(c)(2) of the Bankruptcy Code), *and In re Bennett,* 185 B.R. 4, 6 (Bankr. E.D.N.Y.1995); *In re Hanes,* 162 B.R. 733, 739–740 (Bankr.E.D.Va.1994) (if a restriction on alienation is enforceable under ERISA, IRC § 401(a) qualification is irrelevant to exclusion of the debtor's beneficial interest in an ERISA plan from the estate under section 541(c)(2)). *See also In re Goldschein,* 244 B.R. 595, 600–601 (Bankr. D.Md.2000) (declining to hold that every plan governed by ERISA and containing an anti-alienation provision must also obtain tax qualification under IRC § 401(a), but holding that "where a tax qualified plan is involved, Congress intended the provisions of ERISA and the provisions of the Internal Revenue Code to work in consort.... In order to be entitled to the exclusion of benefits from the bankruptcy estate, the plan must comply with the provisions of both statutes."). *See generally Litman,* 9 Am. Bankr.Inst. L.Rev. at 652–555, 697 (concluding that additional IRC § 401(a) qualification is not required for section 541(c)(2) to apply); Sabino & Clark, "The Last Line of Defense: The New Test for Protecting Retirement Plans from Creditors in Bankruptcy Cases," 48 Ala. L.Rev. 613, 628–51, 668 (1997) (same).

 Resolution of this controversy is determinative of HSBC's motion, because, as provided in the regulation cited by the

Supreme Court in *Shumate,* 504 U.S. at 759, 112 S.Ct. 2242, a plan's favorable tax qualification under IRC § 401(a) can be revoked if a plan that facially conforms with ERISA is operated in violation of the requirements of IRC § 401(a). *See* 26 C.F.R. § 1.401(a)–13(b)(1) (1991).[15] One of the many prohibited transactions constituting grounds for revoking favorable tax qualification under IRC § 401(a) is a direct or indirect loan between a plan and a disqualified person and a direct or indirect transfer to, or use by or for the benefit of, a disqualified person of a plan's income or assets. 26 U.S.C. § 4975(c)(1)(B), (D); *see also* Rev. Rul. 71–437, 1971–2 C.B. Disqualification also will be appropriate if excess contributions were made to the plan, as occurred here. *See* 26 C.F.R. § 1.415–9(a)(1). Thus, if qualification under IRC § 401(a) is necessary for Mr. Handel's interest in the Plan to be excluded from his chapter 7 estate, it would not be excluded from the estate under section 541(c)(2).[16] On the other hand, as discussed below, as long as the Plan was drafted to comply facially with Part I of ERISA, as it was, the Plan's anti-alienation provision is enforceable under ERISA notwithstanding that the Plan was operated in violation of ERISA. *See, e.g.,* Christy & Skeldon, *Shumate and Pension Benefits in Bankruptcy,* 2 J. Bankr.L. & Prac. 719, 725 (1992) ("A plan is *subject to ERISA* solely on the basis of the type of benefits it provides. Beyond that there is nothing under ERISA similar to the multitudinous requirements under the IRC [for favorable tax qualification].") (emphasis in original).

Mr. Handel asserts, however, that the issue is moot because the IRS' determination letters already decided that the Plan qualifies under IRC § 401(a). His position overlooks, though, that the IRS letters state that qualification of the Plan "will depend on its effect in operation under its present form," and it does not appear that the IRS was informed of Mr. Handel's conduct with respect to the Plan. *See In re Goldschein,* 244 B.R. at 601–602 (declining to be bound by favorable IRS determination letter where plan was operated in disregard of IRC); *In re Meinen,* 228 B.R. at 390–392 (relying on IRS determination letters only after concluding that there was no failure to disclose a material fact in the application process and the IRS' review was not limited in scope); IRS Publication 794, Favorable Determination Letter, at 1 (Rev. July 2001):

> A favorable determination letter expresses the Service's opinion regarding the form of the plan document. However, to be a qualified plan under IRC Section 401(a) entitled to favorable tax treatment, a plan must satisfy, in both form *and operation,* the requirements of Section 401(a).

(Emphasis added.) *See also Esden v. Bank of Boston,* 229 F.3d 154, 175–76 (2d Cir.2000) (a plan may not rely on determination letters to shield it from liability. "The Code expressly provides that 'a written determination may not be used or cited as precedent.' "), citing IRC § 6110(k)(3).

For the reasons stated in *In re Bennett,* 185 B.R. at 6, and *In re Meinen,* 228 B.R. at 378–80, however, compliance with IRC § 401(a) is not required for Mr. Handel's Plan assets to be excluded from his estate. *Shumate* relied first and foremost on the

---

**15.** This issue was not determinative in *Shumate,* because the plan there was both tax-qualified under IRC § 401(a) and subject to title I of ERISA. 504 U.S. at 755, 112 S.Ct. 2242.

**16.** Nor would Mr. Handel's interest in his law firm's Plan be exempt under N.Y. DCL § 282(iii)(2)(e); NY CPLR § 5205(2) as recognized by section 522 of the Bankruptcy Code. *See In re Feldman,* 171 B.R. at 735–38.

plain meaning of section 541(c)(2) of the Bankruptcy Code and the fact that the plan at issue had an alienation prohibition that was, consistent with section 541(c)(2), enforceable under ERISA. 504 U.S. at 759–60, 112 S.Ct. 2242. Therefore, the Court's reference to the "coordinate" anti-alienation provision of IRC § 401(a)(13), *id.* at 759, 112 S.Ct. 2242, and the close relationship between ERISA and the favorable tax treatment afforded some ERISA plans under the IRC, while supportive of *Shumate's* holding, was not necessary for that holding. Instead, adding a requirement that a plan subject to ERISA's prohibition of alienation also must be tax-qualified under IRC § 401(a) before it is excluded from the estate would violate the plain language of section 541(c)(2). It would mean that a prohibition of alienation must be enforceable under not one but, rather, two applicable laws, which is not what section 541(c)(2) says. It would also frustrate the strong policy of protecting pension benefits in a consistent manner, as articulated by *Shumate*. *Id.* at 764–65, 112 S.Ct. 2242.

B. *Does it Matter that the Plan Was Operated in Violation of ERISA?* A perhaps harder issue is whether under section 541(c)(2) of the Bankruptcy Code a plan that on its face has an anti-alienation provision enforceable under ERISA but, unlike the plan in *Shumate,* is not operated in compliance with ERISA is excluded from the estate. *Collier* notes that the courts have split on this issue, on which it does not take a position. 5 *Collier on Bankruptcy* ¶ 541.11[7][b] (15th ed.2003) at 541–73–4.

■ In at least two cases when a debtor has, in effect, used pension assets as a personal bank, borrowing freely from a plan in derogation of 29 U.S.C. §§ 1056(d)(1) and 1103(a) and otherwise exerting control in violation of ERISA,

bankruptcy courts have declared the debtor's interest in a plan that on its face complied with ERISA to be property of the estate. *In re Goldschein,* 244 B.R. at 601–602; *In re Harris,* 188 B.R. at 450–51; *see also Bernstein v. Greenpoint Sav. Bank (In re Lane),* 149 B.R. 760, 765–66 (Bankr.E.D.N.Y.1993) (interest in ERISA plan that complied on paper but was maintained as "top-heavy" is property of the estate). Undoubtedly, there is support in logic and equity for this proposition. As stated by the court in *Goldschein,* why should a debtor receive the benefits of the alienation prohibition in a plan and a statute that the debtor has materially disregarded in its operation? 244 B.R. at 602.

Support for this approach also appears in *Shumate,* where the Court described ERISA as "ensuring that 'if a worker has been promised a defined pension benefit upon retirement—*and if he has fulfilled whatever conditions are required to obtain a vested benefit*—he actually will receive it.'" 504 U.S. at 765, 112 S.Ct. 2242, quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 376, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (emphasis added). The Court also described the plan at issue in *Shumate* as one that "satisfied all applicable requirements of [ERISA]...." *Id.* at 755, 112 S.Ct. 2242.

However, the argument breaks down when one asks what conditions or requirements are necessary to maintain vested, inalienable benefits under ERISA, because, as opposed to favorable tax qualification under IRC § 401(a), which may be lost as a result of a beneficiary's violation of that section, a beneficiary's violation of ERISA is not a defense to the enforcement of ERISA's alienation prohibition. To the contrary, ERISA contains only very limited exceptions, here inapplicable, to the enforcement of its prohibition of alienation under 29 U.S.C. § 1056, and

none of those exceptions pertains to a beneficiary's or plan trustee's violation of ERISA in the ways that Mr. Handel or the Plan trustees violated ERISA. Instead, but for very limited statutory exceptions, ERISA's prohibition of alienation is enforceable as long as the plan *on its face* complies with ERISA. *See* 29 U.S.C. §§ 1002(2), 1056(d), 1332(a); *see also Littman*, 9 Am. Bankr.Inst. L. Rev at 692: "[Q]ualification under the [IRC] is not a prerequisite for the enforcement of an antialienation provision in a plan subject to title I [of ERISA]," citing *Donovan v. Shaw*, 668 F.2d 985, 990 (8th Cir.1982).

Moreover, the Supreme Court made it clear in *Guidry*, 493 U.S. at 365, 110 S.Ct. 680, that there are no equitable exceptions to the enforcement of ERISA's anti-alienation requirement:

> As a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text. The creation of such exceptions, in our view, would be especially problematic in the context of an antigarnishment provision. Such a provision acts, by definition, to hinder the collection of a lawful debt. A restriction on garnishment therefore can be defended *only* on the view that the effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between particular parties. It makes little sense to adopt such a policy and then to refuse enforcement whenever enforcement appears inequitable. A court attempting to carve out an exception that would not swallow the rule would be forced to determine whether application of the rule in particular circumstances would be 'especially' inequitable. The impracticality of defining such a standard reinforces our conclusion that the identification of any exception should be left to Congress.

*Id.* at 376–77, 110 S.Ct. 680 (emphasis in the original). Once could take issue with the last two sentences of the foregoing quotation by distinguishing between a beneficiary's generally inequitable conduct, such as the embezzlement of union funds by the official in *Guidry*, and conduct, such as Mr. Handel's, that violates the very alienation prohibition that the beneficiary later seeks to enforce. Nevertheless, since *Guidry* courts generally have refused to make that distinction, with the exception of *Goldschein* and *Harris*, cited above. *See, e.g., Traina v. Sewell (In re Sewell)*, 180 F.3d 707, 712 (5th Cir.1999); *In re Baker*, 114 F.3d 636, 640 (7th Cir.1997) ("'[v]iolations of ERISA do not make ERISA inapplicable." Indeed, "if extensive violation of a federal law made that law go away, the rules would be chimerical. . . . [F]or purposes of *Patterson*, what matters is the application of ERISA's subchapter I, rather than observance of its rules."); *Barkley v. Conner (In re Conner)*, 73 F.3d 258, 259 (9th Cir.1996), *cert. denied* 519 U.S. 817, 117 S.Ct. 68, 136 L.Ed.2d 29 (1996) ("In interpreting the § 541(c)(2) exemption to cover ERISA plans, the Supreme Court appears to have discounted any distinctions based on the debtors' control of their assets."); *Velis v. Kardanis*, 949 F.2d 78, 82–3 (3d Cir.1991) (borrowing from a plan subject to ERISA's alienation prohibition does not render the undistributed assets in the plan part of the debtor's estate); *Kaler v. Craig (In re Craig)*, 204 B.R. 756, 761 (D.N.D.1997); *Butler v. Becton, Dickinson & Co. (In re Loomer)*, 198 B.R. 755, 762 (Bankr.D.Neb.1996) (although debtor borrowed significant amounts from ERISA plan, "[a]ccess or control of funds in a qualified ERISA plan does not defeat either the statutory alienation prohibition, or Bankruptcy Code § 541(c)(2)'s exclusion from property of the estate.").

In the non-bankruptcy context, perhaps the best example of the extremely limited defenses to enforcement of ERISA's alienation prohibition are those decisions that consider whether a plan fiduciary's interest in an ERISA plan can be reached to satisfy claims against the fiduciary for breach of his or her fiduciary duty to the plan itself. *Guidry* expressly did not decide whether 29 U.S.C. § 1109(a) (which provides that a plan fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate") is trumped by the alienation prohibition of 29 U.S.C. § 1056(d)(1). 493 U.S. at 373, 110 S.Ct. 680. Later courts have split over the issue, but *no* court appears to have held that a plan fiduciary is estopped from enforcing the anti-alienation provision by his or her breach of the plan and ERISA. Rather, the courts that have subjected faithless fiduciaries' plan assets to attack have relied on 29 U.S.C. § 1109(a), which gives standing only to beneficiaries, plan fiduciaries and the plan itself, not to third-party creditors, such as HSBC, to seek redress for such losses. *See, e.g., Coar v. Kazimir,* 990 F.2d 1413, 1420–21 (3d Cir. 1993); *Brovarski v. Local 1205,* 1998 WL 765141 (E.D.N.Y.1998). Such cases therefore reject the possible distinction between a beneficiary's generally inequitable conduct and conduct in violation of the plan and ERISA, and, if they provide a remedy at all against the wrongdoer's plan assets, they do so based only on an express provision of ERISA that is not available to HSBC.

As noted in *Shumate,* the fact of a beneficiary's bankruptcy should not change the result that would apply outside bankruptcy. 504 U.S. at 764–65, 112 S.Ct. 2242; 11 U.S.C. § 541(c)(2). Nor should an equitable exception be grafted onto the plain language of 29 U.S.C. §§ 1002(2), 1056(d)(1) and 1332(a) as applied under section 541(c)(2) of the Bankruptcy Code, particularly where, as here, there is a strong countervailing policy—that is, the protection of pension benefits. 29 U.S.C. § 1001. Accordingly, Mr. Handel's interest in the Plan is not property of his chapter 7 estate.[17]

█ III. *Disclosure of the Insurance Policies in the Exemption Schedule.* HSBC contends that Mr. Handel's Exemption Schedule did not list the Insurance Policies with enough specificity to be entitled to an exemption. "[E]xempting property is not a game of hide and seek, and the initial burden falls upon the debtor to particularize her exemptions in order to permit a trustee to ascertain, *without any further substantial inquiry,* those properties which a debtor believes to be exempt from distribution to creditors." *In re de Kleinman,* 172 B.R. 764, 770 (Bankr. S.D.N.Y.1994) (citations and internal quotations omitted; emphasis in the original).

█ However, Mr. Handel's Exemption Schedule identifies the Insurance Policies by (a) name of insurer, (b) policy number, (c) type of policy (whole life or term) and (d) face amount of coverage. This was enough to enable the chapter 7 trustee and other interested parties to inquire into whether the Policies are in fact exempt

---

**17.** For these reasons, I discount in the present context dicta in *Sewell,* 180 F.3d at 713 n. 21, and *Baker,* 114 F.3d at 638, that there may be some ERISA plans (such as plans that give the beneficiaries unfettered ability to invade the plan's principal) that will not be excluded from the estate under section

541(c)(2) of the Code notwithstanding the enforceability of their anti-alienation provisions under ERISA. Such an approach would reintroduce spendthrift trust law into an area from which it was excluded by *Shumate.* 504 U.S. at 762, 112 S.Ct. 2242.

under New York law as recognized by section 522 of the Bankruptcy Code. *See In re Doyle,* 209 B.R. 897, 902 (Bankr. N.D.Ill.1997) (insurance policies insufficiently identified because the debtor did not list the policy issuer or policy number); *see also In re Polanowski,* 258 B.R. 86, 90 (Bankr.W.D.N.Y.2001). Having adequately identified the Insurance Policies in the Exemption Schedule, Mr. Handel satisfied his burden of production. Having failed to inquire further regarding the Insurance Policies or timely raise any substantive objection to the claimed exemption, HSBC has not met its burden of proof under Bankruptcy Rule 4003(c). *Carter v. Anderson (In re Carter),* 182 F.3d 1027, 1029 n. 3 (9th Cir.1999).

### Conclusion

For the foregoing reasons, HSBC's motion is denied. Mr. Handel is directed to submit an order within ten days in conformity with this decision.